**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Frankie Gerald BURTON, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 6, 2000.

Filed Feb. 28, 2001.

William E. Moore, Lansdale, for appellant.

Michael Marino, Assistant District Attorney, Norristown, for Commonwealth, appellee.

Before JOHNSON, FORD ELLIOTT, and OLSZEWSKI, JJ.

OLSZEWSKI, J.:

¶ 1 Frankie Gerald Burton appeals his judgment of sentence. We affirm.

On August 30, 1998, ... a man on a bicycle approached [K.V.], then aged thirteen, and asked her whether she liked a musical group named "Bones, Thugs and Harmony." He then asked if she "wanted to get it on," blocked her path with his bicycle and grabbed her buttocks. [K.V.] ... identified that man as [appellant]. The time was approximately 6:47 p.m.

At 7:40, police learned of a woman [Diane Foreman] approximately one mile away in Horsham Township who reported a man matching [appellant's] description, and riding a bicycle, approached her as she walked on the street, talked to her and finally grabbed her buttocks. Although this victim was approximately 30 years old, ... her appearance resembled that of a teenage girl.... [S]he wore shorts, a t-shirt, sneakers and a ponytail, and ... [appellant] "kept asking [her] how old [she] was." She would also testify that [appellant] was wearing a portable CD player on his waistband.

At approximately 8:20 p.m., in Hatboro, Morris Shatzkin, 76, was assaulted

by a man he identified as [appellant], who attempted to steal his automobile in the parking lot of a fast-food restaurant. [Mr. Shatzkin testified] that [appellant] "reeked of alcohol," that [appellant] demanded his wallet, and that [appellant] told him he ( [appellant] ) was in trouble and wanted Shatzkin to "take him somewhere." The location of this attempted robbery was approximately one mile from the previous incident. Between 9:00 p.m. and 9:20 p.m., a man identified as [appellant], and riding a blue Huffy mountain bike, approached [R.E.] and [C.A.], aged 15 and 17, respectively, ... and attempted to rob them of money. This incident occurred less than one-quarter mile from the attempted carjacking.

At approximately 10:00 p.m., police received a report of an attempted burglary of the McPeak residence, only fifty yards from the attempted robbery of [R.E.] and [C.A.]. At approximately 10:15 p.m., police received a report of a burglary from the Frieman residence, which abuts the back yard of the McPeak residence. For both the McPeak and Frieman residences, children's toys were in the yards, and were visible from the street.... [O]ne of the residents of the burgled homes had seen [appellant] riding his bicycle through the neighborhood, looking down the driveways, into the yards.

Finally, at 10:54 p.m., police received a report that a man matching [appellant's] description had broken into the Staples residence, less than one-quarter mile away, and had attempted to abduct a girl before fleeing. The girl, [L.S.], was eight years old at the time. She said that when she escaped from [appellant], she saw her dog leap at [appellant] with his fangs bared, as if preparing to bite him on the wrist. The police later investigated the crime scene at the Staples residence and found a black glove that came from the Frieman residence. As with the McPeak and Frieman residences, children's toys in the back yard were visible from the street.

As soon as they received the last report, police went to a park approximately 50 to 100 yards from the Staples residence. There they found a blue Huffy mountain bike near the park entrance. Next to the bicycle was a woman's purse, which contained identification belonging to Lisa Frieman. Protruding from the purse was a portable CD player. The officers then saw and apprehended [appellant]. He exuded an odor of alcoholic beverage. A search of his pockets revealed a set of automobile keys belonging to the Staples family. He also carried a CD by the musical group "Bones, Thugs and Harmony." He was bleeding from what appeared to be puncture wounds on his wrists. He told the officers the bicycle was his, and that he had stolen the purse by breaking through a screen and entering a home. He also stated that he had cut his arm by punching through a glass pane to burglarize another house, and had knocked a girl down a flight of steps during this burglary.[1]

Trial Court Opinion, 6/19/00, at 16–18 (citations omitted). Following a trial, a jury found appellant guilty of robbery as to C.A. and R.E., terroristic threats as to Mr. Shatzkin, C.A., R.E., and L.S., burglary

---

1. At appellant's preliminary hearing, another victim, E.A., testified regarding an assault similar to K.V.'s. See N.T. Preliminary Hearing, 10/1/98, at 7. Because the incident took place on August 1, however, the trial court granted appellant's motion to sever as to E.A. See N.T. Suppression, 6/16/99, at 3.

and theft as to the Frieman and Staples residences, indecent assault as to K.V. and Ms. Foreman, attempted burglary of the McPeak residence, attempted kidnapping of L.S., attempted robbery of Mr. Shatzkin's motor vehicle, solicitation and stalking as to K.V., and simple assault as to L.S.[2] *See* N.T. Verdict, 7/16/99, at 149–51. The trial court sentenced appellant to 42 to 118 years' imprisonment. *See* N.T. Sentencing, 9/7/99, at 90. This appeal followed.

¶ 2 Appellant raises nine issues on appeal:

I. Did the Trial Court err in granting [the] Commonwealth's [m]otion to consolidate?

II. Did the Court err in not granting [appellant's] [m]otion for a new jury panel?[3]

III. Did the Court err in allowing the in-court identification by witnesses?

IV. Was the photo lineup unduly suggestive?

V. Was [appellant] arrested without probable cause and questioned without being advised of his *Miranda Warnings* [sic]?

VI. Was there sufficient evidence to convict [appellant] of the crime of attempted burglary of the McPeak residence?

VII. Was the sentence excessive and did it constitute cruel and unusual punishment?

VIII. Was trial counsel ineffective for not requesting a live lineup?

IX. Was trial counsel ineffective for refusing to present witnesses requested by [appellant]?

Brief for Appellant at 7.

¶ 3 Appellant first claims that the trial court erred in granting the Commonwealth's motion to consolidate all of the charges against him, as well as in denying his motion to sever the charges. *See* Brief for Appellant at 16. "The determination of whether separate indictments should be consolidated for trial is within the sole discretion of the trial court and such discretion will be reversed only for a manifest abuse of discretion or prejudice and clear injustice to the defendant." *Commonwealth v. Boyle*, 733 A.2d 633, 635 (Pa.Super.1999). Rules of Criminal Procedure 1127 and 1128 state the appropriate standards for consolidation and severance:

### RULE 1127. JOINDER–TRIAL OF SEPARATE INDICTMENTS OR INFORMATIONS

**A. Standards.**

(1) Offenses charged in separate indictments or informations may be tried together if:

(a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or

(b) the offenses charged are based on the same act or transaction.

\* \* \*

### RULE 1128. SEVERANCE OF OFFENSES OR DEFENDANTS

The court may order separate trials . . . if it appears that any party may be

---

2. The jury acquitted appellant of one charge of indecent assault, which pertained to a nine-year-old girl, A.S., who reported an incident similar to K.V.'s.

3. Because appellant has withdrawn this issue for appeal, *see* Brief for Appellant at 21, we need not address it further.

prejudiced by offenses ... being tried together.

Pa.R.Crim.P. 1127, 1128. Pursuant to these rules, we must determine:

"[1] whether the evidence of each of the offenses would be admissible in a separate trial for the other; [2] whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative; [3] whether the defendant will be unduly prejudiced by the consolidation of the offenses."

*Boyle*, 733 A.2d at 635 (quoting *Commonwealth v. Collins*, 550 Pa. 46, 703 A.2d 418, 422 (1997)). In deciding whether the evidence of each offense would be admissible in a separate trial, we must keep in mind that

"[e]vidence of distinct crimes are [sic] not admissible against a defendant being prosecuted for another crime solely to show his bad character and his propensity for committing criminal acts. However, evidence of other crimes ... may be admissible ... where the evidence is relevant for some other legitimate purpose...."

*Id.* at 636 (citations omitted). Legitimate purposes include:

"(1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial, in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other."

*Id.* (quoting *Commonwealth v. Buchanan*, 456 Pa.Super. 95, 689 A.2d 930, 932 (1997)). Further, evidence of other crimes is ad-missible in " 'situations where the distinct crimes were part of a chain or sequence of events which formed the history of the case and were part of its natural development.' " *Id.* (quoting *Commonwealth v. Billa*, 521 Pa. 168, 555 A.2d 835, 840 (1989)). "This ... is also known as the 'complete story' rationale, *i.e.*, evidence of other criminal acts is admissible 'to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.' " *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491, 497 (1988) (quoting McCormick, *Evidence* § 190 (1972 2d ed.)). Here, each separate offense related to the others to form a logical story. Appellant rode around searching for money or items to sell, as well as a young female with which to have sex. With the exception of Ms. Foreman, who looked like a teenager, all of appellant's victims were young girls. Once appellant realized he had to escape, he attempted to steal a getaway vehicle from Mr. Shatzkin, even confiding that he "was in trouble." Trial Court Opinion, 6/19/00, at 17. After Mr. Shatzkin rebuffed his attempt, he began his search for money in attempting to rob R.E. and C.A. He then began systematically invading nearby homes. Here, he was able to steal both money and goods, as well as nearly abduct a young girl. Each house he targeted had toys visible from the front yard, evidencing his attempt to kidnap a child. These crimes form a logical, sequential pattern to show appellant's course of conduct that night. Moreover, evidence of the robberies and burglaries would also be admissible as proof of motive; appellant needed money and a vehicle to escape the consequences of his conduct. Therefore, the evidence of each of the offenses would be admissible in a separate trial for the others.

¶ 4 Second, the jury was capable of separating each crime. "Where a trial concerns distinct criminal offenses that are distinguishable in time, space, and the characters involved, a jury is capable of separating the evidence." *Commonwealth v. Collins*, 550 Pa. 46, 703 A.2d 418, 423 (1997). Here, the Commonwealth laid each crime out separately and presented witnesses in an easy-to-follow order. Further, the trial judge laid out the charges in an clear manner. The characters in each event were different and, as noted above, the crimes formed a chain of events of distinguishable acts. There is no likelihood that the jury was confused.

 ¶ 5 Lastly, consolidation did not prejudice appellant.

[It] "[i]s not simply prejudice in the sense that appellant will be linked to the crimes for which he is being prosecuted, for that sort of prejudice is ostensibly the purpose of all Commonwealth evidence. The prejudice of which Rule 1128 speaks is rather that which would occur if the evidence tended to convict appellant only be showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence."

*Boyle*, 733 A.2d at 637 (quoting *Lark*, at 543 A.2d at 499). In the case at hand, the trial court explicitly instructed the jury on this very topic:

You must not regard this evidence [of appellant's multiple crimes] as showing that [appellant] is a person of bad character or criminal tendencies from which you might be inclined to infer guilt.

If you find [appellant] guilty at the conclusion of this case it must be because you're convinced by all of the evidence that he committed any or all of the crimes charged, and not because you

believe he is wicked or merely because of the number of offenses charged.

N.T. Trial, 7/9/99, at 172–73. The judge also repeated this instruction to the jury prior to deliberations. *See* N.T. Trial, 7/16/99, at 91–92. We presume that jury members follow the judge's instructions. *See Commonwealth v. Minerd*, 562 Pa. 46, 753 A.2d 225, 232 (2000). Further, the jury acquitted appellant of one charge of sexual assault, *see* N.T. Verdict, 7/16/99, at 150, and we can infer from this that it was able to weigh each charge separately. The trial court thus did not err in consolidating these charges.

 ¶ 6 Next, appellant contends that the trial court erred in allowing various witnesses who could not identify appellant from a photo array to identify him in-court. *See* Brief for Appellant at 22. He specifically names A.S., K.V., J.W., and Mr. Shatzkin. *See id.* We must first determine whether appellant has preserved this issue for appeal.

On October 6, 1999, [appellant] filed his notice of appeal. On October 7, 1999, [the trial] court filed an order directing defense counsel to file a concise statement of matters complained of on appeal (the concise statement) within fourteen days, as provided by Pa.R.A.P. 1925(b). Because [appellant's] appellate counsel had not tried the case, [the trial] court granted counsel's request for an extension of time, by order filed October 27, 1999. The notes of testimony were transcribed and filed of record on December 1, 1999. Nearly two months later, on January 27, 2000, appellate counsel filed the a[sic] statement that listed nine items.

Item nine of the concise statement alleged trial counsel was ineffective for having failed to call certain witnesses to testify at trial, but did not specify the identities of the witnesses.... Conse-

quently, [the trial] court issued a second order, docketed March 6, 2000, directing defense counsel to "file within 14 days, a supplemental Concise Statement of Matters Complained of on Appeal that shall state whether the identities of the witnesses referred to in item nine of the concise statement, and the testimony they were expected to provide, were discussed on the record. . . ."

\* \* \*

Appellate counsel filed the supplemental concise statement on March 24, 2000, three days after the period for doing so had expired.

Trial Court Opinion, 6/19/00, at 2–3. In that statement, appellant raised two new issues, one of which he attempts to include under this issue: "The Court erred in allowing Morris Shatzkin to make an in Court identification since he was unable to make a positive identification of Defendant in the photo lineup and again was unable to positively identify Defendant during the Criminal Preliminary Hearing." Supplemental Statement of Matters Complained of Pursuant to Appellate Procedure Rule 1925(b). It is well-settled that

in order to preserve their claims for appellate review, Appellants must comply whenever the trial court orders them to file a Statement of Matters Complained of on Appeal pursuant to Rule 1925. *Any issues not raised in a 1925(b) statement will be deemed waived.*

*Commonwealth v. Lord,* 553 Pa. 415, 719 A.2d 306, 309 (1998) (emphasis added). Because appellant raised the issue of whether the court erred in allowing those witnesses that were unable to identify appellant in the photo array to identify him during court proceedings, he preserved this issue as to Mr. Shatzkin only if Mr. Shatzkin was unable to identify him in the photo array. Contrary to appellant's as-

sertion, however, Mr. Shatzkin was positive about his photo identification:

Q. And when you went and viewed the photographs, you weren't a hundred percent sure at that time, correct?

A. I was pretty sure when I saw the photographs.

Q. Were you a hundred percent sure?

A. Yes, I was, or I would not have identified him.

N.T. Trial, 6/17/99, at 108. Consequently, appellant waived the issue of Mr. Shatzkin's identification. Because he has not waived the issue as it pertains to the other witnesses, however, we may address it insofar as it concerns them.

In resolving the issue of the reliability of an in-court identification the court looks at the totality of the circumstances surrounding the identification. The relevant factors are as follows:

[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

*Commonwealth v. Fisher,* 545 Pa. 233, 681 A.2d 130, 141–42 (1996) (citations omitted). We begin with K.V., who testified that appellant was two feet away from her during the incident, which occurred in daylight. *See* N.T. Suppression, 6/17/99, at 152, 157. Also, immediately after the incident, she told police her assailant was a tall, thin man with a light, perhaps Puerto Rican complexion, wearing headphones and sunglasses. *See* N.T. Trial, 7/9/99, at 87–89. She was positive regarding her identification. *See id.* at 91. She also stated that prior to the preliminary hearing, where she identified appellant, she did not see any television or newspaper re-

ports regarding appellant. *See id.* at 84–85. Consequently, the court did not err in allowing K.V.'s in-court identification of appellant.

¶ 7 Second, J.W. testified that appellant ranged from ten feet away to fifteen away from her during the incident. *See* N.T. Suppression, 6/17/99, at 170–71. She also gave police a detailed description of appellant immediately after the incident. *See id.* at 176. The court did not err in allowing J.W.'s in-court identification.

¶ 8 Lastly, A.S., who had difficulty identifying appellant in a photo array, testified that during the incident, she "look[ed] at him, but [ ] tried not to." N.T. Trial, 7/9/99, at 196.

THE COURT: Had you ever seen a picture of [appellant] before you went to the preliminary hearing?

THE WITNESS: No.

THE COURT: Did anybody ever tell you that he was—the person who did this to you was going to be at the preliminary hearing?

THE WITNESS: No.

THE COURT: So that when you picked [appellant] out, was it because you knew that he was charged with these other crimes, or was it because you recognized him as being the person who stopped you on the bike that day?

THE WITNESS: Because I knew he was the person that stopped me on my bike that day.

*Id.* at 200–01. This was enough of a description to send the question to the jury, as "misidentification is merely a factor the jury may ... consider[ ] in assessing the credibility of [the witness'] testimony." *Id.* at 142. In fact, the trial court instructed the jury in that very principle:

Now, as a result of the cross-examination of the Commonwealth's witnesses, it has been argued by the defense that evidence exists to show that many of the witnesses gave descriptions or statements that were inconsistent with the testimony that the witness gave in court.

If you find such inconsistencies do exist, you may, if you choose, regard this evidence as proof of the truth of anything that witness said in his or her earlier statement.

You may also consider this evidence to help you judge the credibility and weight of the testimony given by each witness at this trial.

N.T. Verdict, 7/16/99, at 90–91. Apparently the jury did not believe that A.S. was certain, as it acquitted appellant of the charge pertaining to her. In any event, the court did not err in allowing her to identify appellant in court.

¶ 9 Next appellant contends that the photo lineup was "unduly suggestive." Brief for Appellant at 29. Before we begin, the Commonwealth asserts that appellant has waived this claim because he has not included the photo array in his reproduced record. *See* Brief for Appellee at 20. The array is included in the certified record, however. Normally, where our review depends upon materials not present in *the certified record,* appellant's claim is waived. *See Commonwealth v. Lassen,* 442 Pa.Super. 298, 659 A.2d 999, 1008 (1995). "It is a well settled principle that appellate courts may only consider facts which have been *duly certified in the record* on appeal." *Commonwealth v. Bracalielly,* 540 Pa. 460, 658 A.2d 755, 763 (1995) (emphasis added). Because the photo array is in the certified record, we will reach the merits of appellant's claim. Failure to include the array in the reproduced record is of no account.

¶ 10 Appellant contends that the photo lineup was "unduly suggestive in that many of the witnesses described the

perpetrator as wearing a white t-shirt; and in the photo lineup [appellant] was the only person wearing a white t-shirt." Brief for Appellant at 29. "Whether an out-of-court identification is to be suppressed as unreliable, and therefore violative of due process, is determined from the totality of the circumstances." *Commonwealth v. Carson,* 559 Pa. 460, 741 A.2d 686, 697 (1999), *cert. denied,* 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 252 (2000). We will not suppress such identification "unless the facts demonstrate that the identification procedure was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Id.* (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). Further, each person in the array does not have to be identical in appearance. In *Commonwealth v. Monroe,* 373 Pa.Super. 618, 542 A.2d 113, 115 (1988), this Court affirmed a conviction where appellant was the only bald man in the photo array. Here, appellant claims that he was the only one in the photo array wearing a white t-shirt. Examination of the array, however, shows otherwise. The array consists of photocopied pictures of eight subjects, all of whom are African–American men, close in age, with short haircuts and facial hair. Three (C–0451–98–1, C–0451–98–7, and C–0451–98–8) are wearing light colored t-shirts, and one (C–0451–98–4) is wearing a white mock or regular turtleneck with a dark pullover and a white jacket. Because the subjects are very similar in appearance, the photo array was not unduly suggestive.

¶ 11 Appellant next claims that the police did not have a specific description when searching for him, and thus did not have probable cause to arrest him. "[L]aw enforcement authorities must have a warrant to arrest an individual in a public place unless they have probable cause to believe that 1) a felony has been committed; and 2) the person to be arrested is the felon." *Commonwealth v. Clark,* 558 Pa. 157, 735 A.2d 1248, 1251 (1999).

To determine whether probable cause exists to justify a warrantless arrest, we must consider the totality of the circumstances. "[P]robable cause exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed." Probable cause must be "viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest guided by his experience and training."

*Id.* at 1252 (citations omitted). When an arrest is based on a description, the description must be specific. *See Commonwealth v. Jackson,* 459 Pa. 669, 331 A.2d 189, 191 (1975). In *Jackson,* the police dispatcher notified officers that "two [African American] males in dark clothing, 5′6″ to 5′8″ in height, with medium builds, medium to dark complexions and semi-bush haircuts" had shot a man. *Id.* at 190. An hour later, an officer noted an elderly man giving money to a man matching the physical description of the suspects but wearing different clothing. *See id.* The officer approached the two and asked if anything was wrong. *See id.* Despite the fact that the elderly man responded in the negative, the officer arrested the appellant based on his similarity to the description. *See id.* Our Supreme Court held that the officer lacked probable cause to arrest the appellant because of the time lapse between the murder and the arrest, as well as the generality of the description. *See id.* at 191. This was further demonstrated by the fact that various officers arrested fifteen to twenty people that night matching the description. *See id.* at 190 n. 3.

¶ 12 A general description, however, does not always negate probable cause. In *Commonwealth v. Chase,* 394 Pa.Super. 168, 575 A.2d 574, 576 (1990), a police officer told his partner that he "had just purchased narcotics from a black man in a blue shirt at a particular street corner." The second officer went to the street corner, saw a man matching the suspect's description, and arrested him. *See id.* The Court distinguished *Jackson* based on the fact that the police saw the suspect matching the description at the crime scene immediately after the crime. *See id.* at 577. Consequently, the Court held that the officer had probable cause to arrest appellant. *See id.* at 579. Thus, where the description of the suspect is a general one, an officer has probable cause to arrest a suspect where the suspect is "the only individual[ ] who matched the description and [is] found at the same location within a relatively short period of time." *Commonwealth v. Toro,* 432 Pa.Super. 383, 638 A.2d 991, 1004 (1994). The case at hand is more similar to *Chase* and *Toro* than *Jackson.* Hatboro Officer William Krzemien, Jr. and his partner, Officer John Carr, received a call at 6:47 p.m. that a light skinned black or Puerto Rican male wearing dark shorts, sunglasses, a hat, and white socks pulled up to his knees and riding a blue bicycle had indecently assaulted a female juvenile near the Crooked Billet School on Meadowbrook Avenue. *See* N.T. Suppression, 6/16/99, at 36–38. Twenty to forty minutes later, Officer Krzemien received another call that a black male on a bicycle had restrained a nine-year-old girl nearby at York and Monument Avenues. *See id.* at 38. After he questioned her, Officer Krzemien received a call that a tall, thin, white or light skinned black male with facial hair riding a bicycle had attempted to steal a vehicle from a man on York Street. *See id.* at 42, 44. In between the time Officer Krzemien was speaking with the two victims, nearby Horsham Township called Officer Krzemien for help with an incident involving a tall, thin, black male wearing dark shorts, a hat, sunglasses and a t-shirt, riding a bike, who had grabbed a female jogger. *See id.* at 46–47. While Officer Krzemien was searching for the suspect, two boys reported that a light-skinned black male with a mustache wearing dark shorts, a light colored t-shirt, and riding a Huffy mountain bike had robbed them. *See id.* at 48, 49, 51. While the officers were searching for the suspect, the McPeak family, whose house was 450 yards from the robbery scene, reported an attempted burglary. *See id.* at 58. Minutes later, the officers got a call of a burglary at the Frieman residence, directly behind the McPeak residence. *See id.* at 60. Immediately thereafter, the officers received a call from the Staples home, 750 yards away. *See id.* at 66. The dispatcher told officers that a black man with dark shorts tried to take a young girl from her home but fled when her dog confronted him. *See id.* at 67. Before going to the scene, the officers proceeded to the park 325 yards from the Staples residence. *See id.* at 70. As Officer Krzemien entered the parking lot, he saw a blue bicycle and purse in the grass. *See id.* at 72. He opened the purse and saw Ms. Frieman's identification inside. *See id.* The officers then saw a light-skinned black male with a mustache wearing black shorts and a white shirt about twenty-five yards away heading toward the bicycle, who fled upon seeing the officers. *See id.* The officers followed him and arrested him. This is more than enough evidence to demonstrate that the officers had probable cause to arrest appellant. Numerous people gave them consistent physical descriptions of appellant, his clothing, and his bicycle. These descriptions were fairly specific. Further, appellant was next to the last

crime scene immediately following the crime. Appellant's claim fails.

¶ 13 Appellant tacks on a cursory argument stating that he did not receive his *Miranda* warnings. *See* Brief for Appellant at 38. He admits, however, that the police advised him of his *Miranda* warnings. *See id.* He then claims that his "confession [was the] fruit of the initial illegality (arrest) and as such should have been suppressed." *Id.* As we discussed above, his arrest was proper. Regarding *Miranda,* Officer Carr testified that he read appellant his *Miranda* rights after placing him under arrest, and Officer Krzemien confirmed this. *See* N.T. Suppression, 6/16/99, at 174–76, 80. Appellant's claim is without merit.

¶ 14 Appellant next argues that there was insufficient evidence to convict him of the attempted burglary of the McPeak residence because no one actually saw him at the residence. *See* Brief for Appellant at 39. Regardless of whether the Commonwealth presented circumstantial or direct evidence,

> we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict-winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt.

*Commonwealth v. Hargrave,* 745 A.2d 20, 22 (Pa.Super.2000), *appeal denied,* 760 A.2d 851 (Pa. Aug.23, 2000). Moreover, [i]n assessing appellant's sufficiency of the evidence claim, we are mindful that the Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence, which, of necessity, draws into play the affixing of a line of demarcation between the requisite degree of persuasion ("beyond a reasonable doubt") and impermissible specula-

tion. The former is required while the latter is not tolerated as the basis for a conviction. Thus, in the Commonwealth's efforts to establish guilt predicated upon circumstantial evidence, it must be kept in mind that "[t]he inferred fact must flow, beyond a reasonable doubt, from the proven fact where the inferred fact is relied upon to establish the guilt of the accused or the existence of one of [the] elements of the offense."

*Id.* at 23 (quoting *Commonwealth v. Paschall,* 333 Pa.Super. 323, 482 A.2d 589, 591–92 (1984)). Lastly, while "the Commonwealth does not have to establish guilt to a mathematical certainty, and may in the proper case rely wholly on circumstantial evidence, the conviction must be based on more than mere suspicion or conjecture." *Id.* at 22 (quoting *Commonwealth v. Roscioli,* 454 Pa. 59, 309 A.2d 396, 398 (1973)).

¶ 15 The jury found appellant guilty of attempted burglary. "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa. C.S.A. § 901(a). "A person is guilty of burglary if he enters a building or occupied structure, or separately secured or occupied portion thereof, with intent to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter." 18 Pa.C.S.A. § 3502(a). "Intent may be proved by direct evidence or inferred from circumstantial evidence." *Commonwealth v. Cannon,* 297 Pa.Super. 106, 443 A.2d 322, 324 (1982). Ms. McPeak testified that at approximately 10:00 p.m. on August 30, 1998, she and her husband were watching television when they heard a noise. *See* N.T. Trial, 7/12/99, at 144. When they got up to investigate, they noticed that a window screen in the laundry room was

"slashed, cut open and pushed out of its seating in towards the room." *Id.* Because she had recently passed by that window, Ms. McPeak knew it had not been slashed an hour before. *See id.* She looked in the backyard and noticed that someone had placed a lawn chair under the window. *See id.* at 145–46. Hatboro Police Officer Steven Plum, who processed the McPeak crime scene, found a shoe impression on the seat of the chair under the window, which was similar to the tread on the shoes appellant wore at the time of his arrest. *See id.* at 167, 169, 171. Officer Plum also found mud in the impression on the seat, and appellant had grass and mud in the tread of his shoe. *See id.* Further, appellant burglarized the Frieman residence, which backed up to the McPeak residence, between 9:15 p.m. and 9:45 p.m., *see id.* at 197–99, 201, and the Staples residence, which is down the street, at 10:55 p.m. *See* N.T. Trial, 7/13/99, at 40. All of this evidence, when taken in the light most favorable to the Commonwealth as verdict winner, sufficiently proved that appellant attempted to burglarize the McPeak residence.

▆▆▆ ¶ 16 Appellant also argues that the trial court imposed an excessive sentence that constituted cruel and unusual punishment. *See* Brief for Appellant at 43. This is a discretionary challenge to a sentence, and it is well-settled that "[a]ppeals of discretionary aspects of a sentence are not guaranteed of right." *Commonwealth v. Cleveland,* 703 A.2d 1046, 1048 (Pa.Super.1997). An appellant must fulfill two criteria before we will review a discretionary aspect of sentencing: first, he or she must set forth a Pa.R.A.P. 2119(f) statement, which requires that "[a]n appellant

who challenges the discretionary aspects of sentence ... shall set forth in his brief a concise statement of the reasons relied upon for allowance of appeal," and second, he or she "must articulate a substantial question as to the propriety of his sentence." *Cleveland,* 703 A.2d at 1048. While the Commonwealth claims that appellant has not included such a statement, we disagree. Appellant has included the following statement at the beginning of his argument on this issue:

[Appellant] argues the sentence of the trial court was an abuse of discretion in that all the sentences run consecutively and four of the sentences exceed the aggravated range of the guidelines. Additionally, comments made by the sentencing court support [appellant's] claim he was subjected to cruel and unusual punishment. Rule of Appellant [sic] Procedure 2119(f).

Brief for Appellant at 43. We find this sufficient to serve as a Rule 2119(f) statement. We must next determine whether appellant's statement raises a substantial question.

▆▆▆ ¶ 17 As noted above, appellant claims in his Rule 2119(f) statement that the trial court abused its discretion because "all the sentences run consecutively and four of the sentences exceed the aggravated range of the guidelines." Brief for Appellant at 43. In his statement of questions presented, he asks, "Was the sentence excessive and did it constitute cruel and unusual punishment?" *Id.* at 7. In the argument section of his brief, however, appellant claims that the trial judge mistakenly sentenced him using a Prior Record Score ("PRS") of four rather than the correct PRS of three.[4] *See* Brief for

---

4. Appellant's only evidence that the PRS was three is a statement the prosecutor made during trial, *see* N.T. Sentencing, 9/7/99, at 8. The trial court did not acknowledge this state-

ment, however, and appellant has failed to provide us with the pre-sentence report. Consequently, even had appellant raised this issue properly, we do not have the informa-

Appellant at 45. We cannot use appellant's argument to support his statement, however, because "[i]n deciding if a substantial question exists, 'we may not look beyond the statement of questions presented and the concise prefatory 2119(f) statement.'" *Commonwealth v. Jones*, 427 Pa.Super. 345, 629 A.2d 133, 138 (1993) (quoting *Commonwealth v. Scullin*, 414 Pa.Super. 442, 607 A.2d 750, 752 (1992)). Thus we may only decide whether appellant's claim that his sentence was excessive or above the aggravated range poses a substantial question. First, "a claim of excessiveness when the sentence is within the statutory limits is not a substantial question." *Commonwealth v. Nixon*, 718 A.2d 311, 315 (Pa.Super.1998). Second, where the trial court sentences an appellant above the aggravated range, "a substantial question is raised only when the sentence is unreasonable." *Id.* Appellant has not alleged such. Lastly, we will find a substantial question "'[w]here the appellant asserts that the trial court failed to state sufficiently its reasons for imposing sentence outside the Sentencing Guidelines.'" Commonwealth v. Hernandez, 755 A.2d 1, 12 (Pa.Super.2000) (quoting Commonwealth v. Wagner, 702 A.2d 1084, 1086 (Pa.Super.1996 [1997][sic])). Appellant does not allege that the trial court failed to place reasons on the record for sentencing him above the aggravated range, and indeed, he could not do so because the trial court discussed its reasoning at length. See N.T. Sentencing, 9/7/99, at 82–86. Consequently, appellant has not raised a substantial question.

■■■ ¶ 18 Second, appellant claims that his sentence constitutes cruel and unusual punishment because his sentence was excessive, which we have discussed above,

tion before us to make that determination. Appellant would therefore have waived this argument. *See Lassen*, 659 A.2d at 1008

and the trial judge made comments to the effect that appellant's conduct was "'a scourge to children.'" Brief for Appellant at 44 (quoting N.T. Sentencing, 9/7/99, at 91). Appellant cites no authority except a general cite to a cruel and unusual punishment case, then says, "one must come to the conclusion the sentence was either cruel and unusual or an abuse of discretion." *Id.* at 51. Because appellant has failed to develop this argument, it is waived pursuant to Pa.R.A.P. 2119. *See Commonwealth v. Irby*, 700 A.2d 463, 464 (Pa.Super.1997) (holding that "arguments which are not sufficiently developed are waived").

■■■ ¶ 19 Finally, appellant argues that trial counsel was ineffective for various reasons. *See* Brief of Appellant at 52. First, he contends that counsel was ineffective for failing to request a live lineup. *See id.*

> To prevail on a claim of ineffectiveness of counsel, an appellant "must demonstrate (1) that the underlying claim is of arguable merit; (2) that counsel's course of conduct was without a reasonable basis designed to effectuate his client's interest; and (3) that he was prejudiced by counsel's ineffectiveness." It is the appellant's burden to prove all three prongs of this standard. To sustain a claim of ineffectiveness, counsel's approach must be "so unreasonable that no competent lawyer would have chosen it."

*Commonwealth v. Ervin*, 766 A.2d 859, 862 (Pa.Super. 2000) (citations omitted). Appellant claims that he was prejudiced by trial counsel's failure to request a live lineup after some unnamed witnesses could not identify him in a photo array. *See* Brief for Appellant at 53. We presume

(holding that where our review depends on materials not found in the certified record, appellant waives his or her claim).

that appellant is referring to A.S., K.V., and J.W.[5] To begin, the jury acquitted appellant of the charges regarding A.S., and therefore her testimony could not have prejudiced him. Regarding the other two witnesses,

> "an accused does not have a constitutional right to a line-up and the suggestiveness of a courtroom identification is only one factor to be considered in determining the reliability of the identification evidence. Moreover, this jurisdiction has 'declined to accept a per se rule that a pre-trial, pre-hearing line up is mandatory in all cases.' A fortiori, counsel's failure to request a lineup or failure to object to identification testimony is not per se ineffective assistance." [We must then] review the totality of the circumstances to see if there was a reliable independent basis for the in-court identification by the [crime] victim.

*Commonwealth v. Edwards*, 762 A.2d 382, 391 (Pa.Super.2000) (discussing *Commonwealth v. Kenon*, 333 Pa.Super. 366, 482 A.2d 611, 613–14 (1984)) (citations omitted). To assess the totality of the circumstances, we should consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). K.V. was rollerblading when appellant began chasing her on his bike, bumping her skates from behind. *See* N.T. Trial, 7/9/99, at 56–57. In trying to escape him, she skated to a grassy area so that she could walk. *See id.* at 62. At this point, appellant blocked her path with his bike and spoke to her.

*See id.* at 64–65. He then approached her and grabbed her buttocks. *See id.* at 65. Because he was very close and it was light out, *see id.* at 78–79, K.V. got a good look at her assailant. Immediately after the crime, she told police that appellant was a tall, thin man with a light, perhaps Puerto Rican complexion, wearing headphones and sunglasses. *See id.* at 87–89. She was positive regarding her identification. *See id.* at 91. The totality of the circumstances demonstrate that there was "an independent basis for the in court identification." *Edwards*, 762 A.2d at 391.

¶ 20 J.W, who was rollerblading with K.V., originally saw appellant riding a blue mountain bike and staring at her. *See* N.T. Trial, 7/9/99, at 114, 115. She also saw him grab K.V. *See id.* at 117. Immediately following the incident, she told police the assailant was a tall, thin man with a light complexion, wearing shorts, knee high socks, headphones, sunglasses, and a hat. *See id.* at 122–23. While she did not accurately identify him in a photo, she was positive about her in-court identification. *See id.* at 133–34. J.W. demonstrated an independent basis for her identification as well.

¶ 21 Further, appellant has not adequately pleaded prejudice. To prove prejudice, an appellant must show "that the outcome of the trial would have been different." *Ervin*, 766 A.2d at 864. Appellant claims that he was prejudiced because had trial counsel requested a live lineup, certain unnamed witnesses "probably would not have been able to make an identification." Brief for Appellant at 53. This statement is not enough to meet our standards for pleading prejudice. Thus, appellant's ineffectiveness claim fails on those grounds as well.

---

5. As noted earlier, appellant also argued that Morris Shatzkin could not identify him from a photo array. As this was incorrect, we need not address it further.

¶ 22 Appellant next contends that his trial counsel was ineffective for failing to call dog bite expert Paul J. Hoyer and eyewitness Angela Johnson.[6] *See* Brief for Appellant at 54.

"To prevail on a claim of trial counsel's ineffectiveness to call a witness, the [appellant] must show: (1) that the witness existed; (2) that the witness was available; (3) that counsel was informed of the existence of the witness or should have known of the witness's existence; (4) that the witness was prepared to cooperate and would have testified on appellant's behalf; and (5) that the absence of the testimony prejudiced appellant."

*Commonwealth v. Farmer,* 758 A.2d 173, 179 (Pa.Super.2000) (quoting *Commonwealth v. Fletcher,* 561 Pa. 266, 750 A.2d 261, 274–75 (2000)). "[W]e 'will not grant relief based on an allegation that a certain witness may have testified in the absence of an affidavit to show that the witness would, in fact, testify.'" *Id.* (quoting *Commonwealth v. Days,* 718 A.2d 797, 803 (Pa.Super.1998)). Appellant did not attach any affidavits to support his claim, so his claims fail.

¶ 23 Judgment of sentence affirmed.

---

**6.** Ms. Johnson testified as a Commonwealth witness, and appellant's trial counsel conducted cross-examination. *See* N.T. Trial, 7/9/99, at 151–56.