J-S04041-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DEVON MALCOM WILLIAMS | : | |
| | : | |
| Appellant | : | No. 1261 EDA 2023 |

Appeal from the Judgment of Sentence Entered December 19, 2022
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0002148-2021

BEFORE:    BOWES, J., STABILE, J., and LANE, J.

CONCURRING & DISSENTING MEMORANDUM BY LANE, J.:

**FILED JULY 22, 2024**

I concur with the Majority's conclusion that no relief is due on the claim, of Devon Malcom Williams ("Williams"), that the trial court erred in denying suppression of records related to a cell phone attributed to him.  However, for the reasons discussed *infra*, I respectfully disagree with the Majority's disposition of Williams' remaining issues.

First, I would conclude the trial court erred in finding the police had probable cause to detain Williams.  While the Majority cites the trial court's findings of fact, my review of the certified record, as it existed at the time of the suppression ruling, reveals an absence of probable cause based on the following relevant details.

The Pottstown Police Department issued a "be on the lookout" ("BOLO") bulletin, which identified Annette Bowen ("Annette") and her address in Lansford Borough, Carbon County — which is approximately one and a half hours from Pottstown, where the underlying robbery occurred. N.T., 7/22/22, at 73, 74; *see also* Trial Court Opinion, 7/19/23, at 3 n.2. Lansford Police Chief Jeffrey Soberick, who received the BOLO bulletin, believed the robbery occurred "shortly before" the bulletin was sent, but did not know exactly when; I note the incident occurred two days earlier. *Id*. at 77. Chief Soberick knew Annette and her address through prior interactions. *See id*. at 75.

The BOLO bulletin stated Annette was involved in an armed robbery or home invasion with "two associated [B]lack males." N.T., 7/22/22, at 73, 74. Chief Soberick acknowledged that the BOLO contained no further information about the two other assailants, including their height, weight, age, or distinguishing physical characteristics. *Id*. at 74, 92. Furthermore, I note there was no indication the BOLO described the perpetrators' clothing, shoes, or eyewear.

Upon receiving the BOLO bulletin, Chief Soberick reviewed Annette's Facebook account and observed photos of Williams; however, no further evidence about these photos was adduced. *See id*. at 75. Chief Soberick drove by Annette's house and saw Annette and a white man exit a vehicle and enter the house. *See id*. at 76. Chief Soberick parked so that he could watch the front of Annette's house. After "a few minutes," he observed Annette's

next-door neighbors leave and drive away. *Id*. at 76-77. Chief Soberick followed the neighbors. The chief knew the driver, stopped the vehicle, and asked if he knew who was in Annette's house. *See id*. at 77. The driver replied he had seen Annette entering her house with the white man Chief Soberick had seen, as well as with a Black man. *See id*.

Chief Soberick returned to surveilling Annette's house. *See* N.T., 7/22/22, at 78. Around this time, the chief learned an arrest warrant had been issued for Annette. *See id*. at 78-79. He then saw Annette, a white man, and a Black man — Williams — exit the house, enter a car, and drive away. *See id*. at 78. Chief Soberick followed them and called for additional police officers to assist.[1] Another police car joined him, and they all "began to exit the town" and enter a "desolate area." *Id*. At this time, Chief Soberick effectuated what he termed a "felony traffic stop," as the BOLO bulletin had referred to an armed robbery and it was possible the vehicle's occupants were armed. *Id*. Chief Soberick was in full uniform and operating a marked police

_____

[1] When asked why he did not arrest Annette at her home, Chief Soberick explained that his department lacked "manpower" and he did not want police officers to "be surprised with gunfire at the front door." N.T., 7/22/22, at 97.

car.[2]  ***See id***. at 87.  Another police officer, "Officer Soberick" was with Chief

Soberick during the vehicle stop.[3]  ***See id***. at 88.

I review in detail the testimony about the ensuing chronology of events.

Immediately after the above statements concerning his decision to stop the

vehicle, Chief Soberick testified as follows:

[Commonwealth:]  And at that point, you knew that [Annette] was in that car?

[Chief Soberick:]  That's correct. I saw her get in it.

Q.  Okay. And then at this point of the traffic stop that you conducted, ***what happened next***?

A. I took [Annette] into custody.

There was a white male in the car; I believe Dennis Kibler.

And then the [B]lack male seated with his defense counsel over there.  (Indicating)

***I took them all into custody and detained them*** and contacted Pottstown; not directly, though, through the com center.

Q.  And ***at this point why were you detaining the other people in the car along with Annette*** . . . ?

A.  I saw them leaving that residence.  That residence was mentioned in BOLO, and ***that [B]lack male fit the depiction that were allegedly involved in the incident*** [*sic*].

_____

[2] The Commonwealth asked Chief Soberick whether he "activat[ed] the emergency lights on [his] police vehicle."  N.T., 7/22/22, at 87.  The chief replied only, "I was operating a marked unit, correct," and did not explain whether his emergency lights were on.  ***Id***.

[3] The record does not indicate this officer's first name or whether he was related to the Chief.

Q.  Okay.  ***And, again, the description you had at this point in the stop was just that it was a [B]lack male?***

A.  ***Correct.***  That's correct.

Q.  ***Was there any additional information that you gained prior to performing the stop at this point?***

A.  ***Not prior to performing the stop, no***.

N.T., 7/22/22, at 79-80 (emphases added).

The Commonwealth's next question pertained to any additional information gathered during the remainder of the stop:

[Commonwealth:]  So at the stop was there any additional information that you obtained?

[Chief Soberick:]  Yes.  I did — I was able to speak with . . . a confidential informant [("CI")] known to me, and that person advised that the gentleman, the [B]lack gentleman, that was one of the ones involved in the incident.

***Id***. at 80.

The Commonwealth clarified that Chief Soberick talked to the CI ***after*** Annette, Williams, and the third occupant exited the vehicle:

[Commonwealth:]  And so to get the timeline straight: You conduct the stop.  Everyone gets out of the car.

[Chief Soberick:]  That's correct.

Q.  And then when do you get the information from the CI?

A.  ***During*** the traffic stop, actually.

***Id***. at 81 (emphasis added).

Finally, I note the testimonial evidence included only one other reference to Williams' being handcuffed, which arose during cross-examination:

[Williams' Counsel:] Was [Annette] handcuffed and actually formally arrested on the basis of that warrant issued in Montgomery County?

[Chief Soberick:] That's correct.

Q. *Was . . . Williams also handcuffed after being taken out of the car?*

A. *All the occupants of the vehicle were secured.*

*Id*. at 88-89 (emphases added).

The vehicle stop commenced around 2:15 p.m., Annette and Williams were taken to the Lansford Police Station, and the Pottstown Police officers arrived at that station around 5:30 p.m. *See* N.T., 7/22/22, at 87, 101. No evidence was presented, however, as to how long the vehicle stop itself lasted nor when Anette and Williams were ultimately transported to the Lansford Police Station.

In any event, *during* the vehicle stop, Chief Soberick obtained additional information from various sources. As indicated above, he called a CI. However, Chief Soberick provided entirely inconsistent testimony as to what information was provided by the CI. On the one hand, the chief testified that the CI told him: (1) Williams was one of the men "involved in the incident;" and (2) the CI was in Annette's home with Annette and Williams, along with the weapons, silver, money, and other items taken during the Pottstown robbery. *Id*. at 80, 86. On the other hand, Chief Soberick denied

receiving any of this information. Indeed, when asked if the CI had explained what Williams did in the Pottstown robbery, Chief Soberick replied, "Absolutely not. No." *Id*. at 86-87. Furthermore, Chief Soberick stated: (1) at that point of the vehicle stop, he "was[ not] fully aware" the above items were proceeds from the robbery, *id*. at 82; and (2) from the time of the vehicle stop to the arrival of Pottstown Police officers at the Lansford Police Station, he did "***not receive[] any information indicating that . . . Williams was involved in the robbery in Pottstown***[.]" *Id*. at 87 (emphasis added). Finally, Chief Soberick testified that as of the suppression hearing, he "still [did not] know the full details of" the Pottstown incident. *Id*. at 98.

Additionally, ***during*** the vehicle stop, Chief Soberick called Corporal Todd Istenes of the Pottstown Police. *See* N.T., 7/22/22, at 82-83. Chief Soberick described Williams and relayed the CI's information about the firearms, silver bars, and other items. Corporal Istenes confirmed those items were involved in the Pottstown robbery, stated that Williams "fit the description," and accordingly directed Chief Soberick to detain Williams until Pottstown Police officers arrived. *Id*. at 97-98.

On cross-examination, defense counsel asked Chief Soberick what probable cause he had for arresting Williams. *See* N.T., 7/22/22, at 111. Chief Soberick replied that he or one of his police officers had "already seen" a surveillance video and observed that Williams' build, glasses, clothing, and shoes matched those of one of the perpetrators. *See id*. at 111-14. No

further testimony was given, however, as to when particularly the chief or one of his officers viewed the video.

Williams argued before the trial court that he was unlawfully "taken out of the car[ and] taken into custody without . . . probable cause." N.T., 7/22/22, at 66. The trial court denied relief, and the Majority has summarized the findings of fact announced by the court on the record at the hearing. **See** Majority Memorandum at 2-4, 7.

On appeal, Williams asserts the trial court erred in finding there was probable cause to support his warrantless arrest. Williams contends he was in custodial detention once Chief Soberick placed him in handcuffs "immediately after" stopping the vehicle. Williams' Brief at 21. Williams argues the officer's only basis for detaining him at this time was a claim that he matched the description in the BOLO bulletin, but Williams maintains that the sole relevant description in the BOLO bulletin was of a Black male. Williams insists that in the absence of any other identifying information in the BOLO bulletin, the "vague, general description" did not establish probable cause for Chief Soberick to arrest. **Id**. Williams further avers that the **subsequent** information provided by the CI and Corporal Istenes cannot show probable cause because it was provided to Chief Soberick **after** Williams was handcuffed and subjected to a custodial detention.

The trial court did not make any finding as to Chief Soberick's handcuffing Williams when he exited the vehicle, nor the chief's taking "them

all into **custody**" **before** any communication with the CI or Pottstown Police. N.T., 7/22/22, at 79 (emphasis added). Instead, the trial court found Williams was taken into custodial detention **later**, when Corporal Istenes directed Chief Soberick to take Williams into custody. The trial court found that at this **later** time, Chief Soberick possessed the requisite probable cause to arrest Williams, based on: (1) Williams' exiting Annette's residence with Annette, and his presence in the vehicle with Annette; (2) the BOLO bulletin's information that Annette was involved in a robbery in Pottstown with two "associated African-American males;" (3) the information received from the CI **during** the vehicle stop, that Williams was present in Annette's home and that "the CI had observed guns and silver bars inside the house;" (4) that these were the same items reported stolen during the robbery; and (5) Corporal Istenes' confirmation that Chief Soberick's description of Williams matched the complainants' descriptions, as well as the police's observations of the perpetrator in the surveillance video. Trial Court Opinion, 7/19/23, at 12-13. The trial court concluded that under the totality of the circumstances, Corporal Istenes had sufficient probable cause to believe Williams participated in the robbery, and therefore had authority to direct Chief Soberick to arrest him. **See id**. at 13.

The Majority reasons that Williams was **not** taken into custody when he was handcuffed immediately upon the commencement of the vehicle stop. **See** Majority Memorandum at 8. The Majority acknowledges Chief Soberick's

testimony that when he took Annette into custody, he also "took them all [*sic*] into custody and detained them and contacted Pottstown" Police. *Id*. (*citing* N.T., 7/22/22, at 79). However, the Majority emphasizes Chief Soberick's testimony that **after** he received information from the CI, he "detained" Williams and Annette and transported them to the police station. *Id*. The Majority concludes this exchange supported the "obvious" finding by the trial court that Williams was not arrested until "after" Chief Soberick obtained the additional information. *Id*. Thus, the Majority concludes, the information possessed by Chief Soberick at the time of this latter detention was sufficient to establish probable cause — and the chief did not rely solely on the information contained in the BOLO. *See id*. at 9.

I respectfully disagree. I would conclude that the trial court's finding, that Williams was **only** taken into custodial detention when Corporal Istenes directed that he be detained, is not supported by the suppression record. The trial court's finding ignores Chief Soberick's testimony that Williams was already handcuffed and in "custody" **before** he contacted either the CI or Pottstown Police. *See* N.T., 7/22/22, at 79-80 (Chief Soberick stating he "took them all into custody and detained them and [then] contacted Pottstown" Police, based on the chief's observation of them leaving Annette's residence and Williams' fitting the BOLO's description that a Black male was involved); *see also id*. at 88-89 (agreeing that Williams was "also handcuffed after being taken out of the car").

In sum, in my view the suppression record established two separate events. First, all three occupants of the vehicle were taken "into custody and detained" at the same time, and all three were handcuffed as they exited the vehicle, **before** Chief Soberick obtained further information from the CI or Pottstown Police. *Id*. at 79. I would conclude this was a custodial detention, which, again, the trial court did not address. Second, **after** Chief Soberick gathered information from the CI and Pottstown Police, Pottstown Police directed the chief to detain Williams. I would conclude this verbal directive was a non-event, as Williams was already in custody. Yet, this is the only "detention" that the trial court considered.

To the extent that the Majority implies that Williams' handcuffing was one and the same as Chief Soberick's detaining him at Pottstown Police's direction, I would disagree. When the Commonwealth examined Chief Soberick about the **initiation** of the traffic stop, it asked, "at this point of the traffic stop[,] what happened next?" N.T., 7/22/22, at 79. Chief Soberick clearly responded, "I took [Annette] into custody. There was a white male [and a Black male in the car]. **I took them all into custody and detained them and contacted Pottstown"** Police. *Id*. (emphasis added). The Commonwealth asked specifically, "at this point why were you detaining the other people in the car along with Annette . . . ?" **Id**. Chief Soberick responded he relied **solely** on the BOLO and his observation of Williams leaving Annette's house. **See id**. (Chief Soberick stating, "I saw them leaving

- 11 -

that residence. That residence was mentioned in [the] BOLO, and that [B]lack male fit the depiction that were allegedly involved in the incident"). Within this same exchange, Chief Soberick confirmed the **only** "description [he] had at this point in the stop[ ] was just that it was a [B]lack male." **Id**. On cross-examination, defense counsel asked about handcuffing Annette and whether Williams was "**also** handcuffed after being taken out of the car," and Chief Soberick replied in the affirmative. **Id**. at 89 (emphasis added).

In any event, both the Majority and the trial court's proposed timeline assumes two factual premises that are not supported by the record. First, Annette would have been detained or arrested first, while Williams was not arrested until some time later, after Chief Soberick's numerous phone calls with the CI and Pottstown Police. However, Chief Soberick's clear testimony is that upon stopping the vehicle, he "**took them all into custody and detained them** and contacted Pottstown" Police. N.T., 7/22/22, at 79 (emphasis added). Second, under this same scenario, Williams would have voluntarily stayed at the scene while Chief Soberick made the numerous phone calls to gather information. However, the Commonwealth, who bore the burden of proving Williams' rights were not violated, presented no evidence that Williams was permitted to leave at any time. **See Commonwealth v. Moore**, 310 A.3d 802, 806 (Pa. Super. 2024) (stating that "once a motion to suppress evidence has been filed, it is the Commonwealth's burden to prove, by a preponderance of the evidence, that

the challenged evidence was not obtained in violation of the defendant's rights).

For the foregoing reasons, I respectfully disagree with both the trial court and the Majority's conclusion that Williams was not taken into custody until Chief Soberick subsequently received a directive from Pottstown Police to detain him. The suppression record, when read as a whole, does not support such a finding. *See Commonwealth v. Bernard*, 218 A.3d 935, 940 (Pa. Super. 2019) (setting forth appellate standard of review). Instead, Williams was detained at the inception of the vehicle stop, when he was handcuffed, taken "into custody and detained," and not permitted to leave. *See* N.T., 7/22/22, at 79. Again, I emphasize that neither the suppression hearing transcript nor the trial court's opinion indicate the trial court addressed this handcuffing.

Accordingly, I would determine the trial court mis-framed the issue as whether Chief Soberick or Pottstown Police possessed probable cause to arrest Williams *after* information was gathered from the CI and the Pottstown Police. Any information that the Lansford Police learned *after* the handcuffing and taking Williams into custody at the inception of the vehicle stop, even if during the same vehicle stop, was not relevant to the probable cause determination. *See Commonwealth v. Jackson*, 331 A.2d 189, 191 (Pa. 1975).

Instead, the proper inquiry was whether Chief Soberick had probable cause when he handcuffed Williams at the outset of the vehicle stop. *See*

**Bernard**, 218 A.3d at 940; **see also Jackson**, 331 A.2d at 191. I would conclude he did not. I reiterate that the BOLO bulletin provided a physical description of merely "two associated [B]lack males." N.T., 7/22/22, at 74. Chief Soberick confirmed "[t]hat was all that [he] had at that time," as there was no description of the two men's height, weight, age, or any distinguishing physical characteristics. **Id**. at 74, 92. The BOLO was silent as to the perpetrators' clothing, shoes, or eyewear. While Chief Soberick did learn one of the perpetrators had misaligned teeth, he could not recall when, and in any event, the chief did not make any indication that the appearance of Williams' teeth was a factor in why he handcuffed him. **See id**. at 92.

I also consider that although Chief Soberick "knew" the armed robbery or home invasion occurred sometime "shortly before" the BOLO bulletin, he did not know particularly when. N.T., 7/22/22, at 73, 77. I reiterate that the robbery occurred two days earlier.

With respect to Chief Soberick's investigation of Annette's social media, he testified: he knew of Annette and her address, he "started scouring what [he] could find on social media for" her, and he "found . . . Williams['] associated pictures associated [*sic*] with her on Facebook." **Id**. at 75. This was the sum of the evidence about Annette's Facebook account. There was no evidence about when or where the photographs were taken, when they were posted to the Facebook account, what the photographs depicted, or whether they showed any link to the crime or proceeds of the crime. Indeed,

while the police investigation later revealed Williams and Annette were in a romantic relationship, there was no testimony at the suppression hearing about whether Annette's Facebook account showed the nature of their relationship.

Finally, the remaining evidence presented was that Chief Soberick initially observed Annette exiting her car with a white man, and subsequently, Annette exiting her house with a white man and a Black man, and all three entering a car and driving away. There was no suggestion that the car was connected to the Pottstown robbery. Under the totality of the circumstances, I would conclude the sum of this information would not support a finding that Chief Soberick had probable cause when he handcuffed Williams and took him into custody at the inception of the vehicle stop.

I consider the decision in ***Commonwealth v. Burton***, 770 A.2d 771, 782 (Pa. Super. 2001). In that appeal, the defendant argued police officers "did not have a specific description when searching for him, and thus did not have probable cause to arrest him." ***Id***. at 782. This Court first summarized:

> When an arrest is based on a description, the description must be specific. ***See*** [***Jackson***, 331 A.2d at 191]. In ***Jackson***, the police dispatcher notified officers that "two [African American] males in dark clothing, 5'6" to 5'8" in height, with medium builds, medium to dark complexions and semi-bush haircuts" had shot a man. An hour later, an officer noted an elderly man giving money to [the defendant, who] match[ed] the physical description of the suspects but [was] wearing different clothing. The officer approached the two and asked if anything was wrong. Despite the fact that the elderly man responded in the negative, the officer arrested the [defendant] based on his similarity to the description. Our Supreme Court held that the officer lacked probable cause to

arrest [Jackson] because of the time lapse between the murder and the arrest, as well as the generality of the description. . . .[4]

A general description, however, does not always negate probable cause. In **Commonwealth v. Chase**, . . . 575 A.2d 574, 576 (Pa. Super. 1990), a police officer told his partner that he "had just purchased narcotics from a [B]lack man in a blue shirt at a particular street corner." The second officer went to the street corner, saw the suspect matching the description, and arrested him. The Court distinguished **Jackson** based on the fact that the police saw the suspect matching the description at the crime scene immediately after the crime. Consequently, the Court held that the officer had probable cause to arrest [the suspect]. Thus, where the description of the suspect is a general one, an officer has probable cause to arrest a suspect where the suspect is "the only individual[] who matched the description and [is] found at the same location within a relatively short period of time." **Commonwealth v. Toro**, . . . 638 A.2d 991, 1004 (Pa. Super. 1994). . . .

**Burton**, 770 A.2d at 782-83 (emphases and some citations omitted and footnote added).

The **Burton** Court reviewed the facts presented in the matter before it:

Hatboro Officer . . . Krzemien . . . and his partner. . . received a call at 6:47 p.m. that a light skinned [B]lack or Puerto Rican male wearing dark shorts, sunglasses, a hat, and white socks pulled up to his knees and riding a blue bicycle had indecently assaulted a female juvenile near the Crooked Billet School on Meadowbrook Avenue. Twenty to forty minutes later, Officer Krzemien received another call that a [B]lack male on a bicycle had restrained a nine-year-old girl nearby at York and Monument Avenues. After he questioned her, Officer Krzemien received a call that a tall, thin, white or light skinned [B]lack male with facial hair riding a bicycle

_____

4 **Jackson** involved "dragnet arrests," condemned by the **Jackson** Court, in which police arrested fifteen to twenty people matching the description of the perpetrator within the first few hours of a killing. **Jackson**, 331 A.2d at 190 n.3. No such "dragnet arrest" occurred in this matter. Nevertheless, I construe the above discussion, as set forth in **Burton**, to be relevant in reviewing Williams' instant suppression issue.

had attempted to steal a vehicle from a man on York Street. In between the time Officer Krzemien was speaking with the two victims, nearby Horsham Township called [him] for help with an incident involving a tall, thin, [B]lack male wearing dark shorts, a hat, sunglasses and a t-shirt, riding a bike, who had grabbed a female jogger. While Officer Krzemien was searching for the suspect, two boys reported that a light-skinned [B]lack male with a mustache wearing dark shorts, a light colored t-shirt, and riding a Huffy mountain bike had robbed them. While the officers were searching for the suspect, the McPeak family, whose house was 450 yards from the robbery scene, reported an attempted burglary. Minutes later, the officers got a call of a burglary at the Frieman residence, directly behind the McPeak residence. Immediately thereafter, the officers received a call from the Staples home, 750 yards away. The dispatcher told officers that a [B]lack man with dark shorts tried to take a young girl from her home but fled when her dog confronted him. Before going to the scene, the officers proceeded to the park 325 yards from the Staples residence. As Officer Krzemien entered the parking lot, he saw a blue bicycle and purse in the grass. He opened the purse and saw Ms. Frieman's identification inside. The officers then saw a light-skinned [B]lack male with a mustache wearing black shorts and a white shirt about twenty-five yards away heading toward the bicycle, who fled upon seeing the officers. The officers followed him and arrested him.

**Burton**, 770 A.2d at 783 (record citations omitted).

The **Burton** Court found these facts were "more similar to **Chase** and **Toro** than **Jackson**." **Id**. at 783. The Court thus concluded the officers had probable cause to arrest the defendant:

This is more than enough evidence to demonstrate that the officers had probable cause to arrest [the defendant]. Numerous people gave them consistent physical descriptions of [the defendant], his clothing, and his bicycle. These descriptions were fairly specific. Further, [the defendant] was next to the last crime scene immediately following the crime. . . .

**Id**. at 783-84.

The evidence presented in this case falls far short of that presented in *Burton* and *Chase*, and even *Jackson*. In *Burton*, the police officers received, within an approximate one hour span, six consistent descriptions of a perpetrator — a light skinned Black male with facial hair, wearing dark shorts, light colored t-shirt, and sunglasses, and riding a bicycle. The officers observed the defendant, who matched these physical descriptions, within minutes of the last call, and the defendant fled upon seeing the officers. *See Burton*, 770 A.2d at 783. Here, there was no such detailed description of Williams or the third accomplice, beyond the information that two perpetrators of the home invasion were Black males. Furthermore, unlike the defendant in *Burton*, Williams was not detained until two days after the incident, he was detained in a different county, one and half hours away from Pottstown, and he did not flee when their vehicle was stopped by Chief Soberick.

In *Chase*, a police officer described "a [B]lack man in a blue shirt" at a particular street corner, and his partner "immediately" went to that corner and arrested a man matching the description. *Burton*, 770 A.2d at 783. Here, the BOLO bulletin's description of the perpetrators was even more vague; it merely referred to "two associated [B]lack males" and it did not include any clothing. N.T., 7/22/22, at 74. Additionally, there was no evidence, nor any claim by the Commonwealth, that the vehicle stop was initiated at the same place as, and within a relatively short period after, the Pottstown robbery.

Finally, in **Jackson**, the description of the perpetrators of a shooting was of "two [African American] males in dark clothing, 5'6" to 5'8" in height, with medium builds, medium to dark complexions and semi-bush haircuts." **Jackson**, 331 A.2d at 190. Our Supreme Court held police officers lacked probable cause to arrest the defendant, who matched the physical description but wore different clothing, and was observed "[a]pproximately one hour and one block from the scene of the crime." **Id**. Again, here, there was even less information available to Chief Soberick.

To summarize, I would hold the following evidence, presented at the suppression hearing, was insufficient to establish probable cause to handcuff Williams at the outset of the vehicle stop: the physical description about the two associated perpetrators was merely that they were Black males; Williams is a Black male; Chief Soberick did not know when the Pottstown home invasion occurred; both Annette and her home address were identified in the BOLO bulletin; the chief observed Williams exiting Annette's home, with Annette and a white male, and observed the three enter a car and drive away; and Williams also appeared in undated photographs on Annette's Facebook account. This information was patently insufficient to form a reasonable belief that Williams had committed or was in the process of committing a crime. **See Bernard**, 218 A.3d at 940.

For the foregoing reasons, I would reverse the portion of the suppression order denying suppression of evidence of Williams' detainment, and accordingly vacate Williams' convictions and judgment of sentence.

Accordingly, I would further hold Williams' statement at the police station, concerning the appearance of his teeth, should have been excluded on the ground it was "fruit of an unlawful detention." *Commonwealth v. Mattis*, 252 A.3d 650, 654 (Pa. Super. 2021). Thus, I would also reverse the portion of the trial court's order denying suppression of this statement.

Finally, while the Majority grants relief on Williams' claim that his multiple sentences for conspiracy were illegal, I would not reach this issue based on my conclusion above that this Court should reverse portions of the suppression order. As stated above, I concur with the Majority's conclusion that no relief is due on Williams' suppression claim concerning the records related to a cell phone.

For the foregoing reasons, I respectfully concur in part and dissent in part.