J-A17006-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RONALD CRAWFORD, | |
| Appellant | No. 970 EDA 2014 |

Appeal from the Judgment of Sentence February 28, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003969-2013

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and OTT, J.

MEMORANDUM BY OTT, J.:                              **FILED AUGUST 18, 2015**

Ronald Crawford appeals from the judgment of sentence entered February 28, 2014, in the Philadelphia County Court of Common Pleas. Crawford was sentenced to an aggregate term of 18 to 36 years' imprisonment following his jury conviction of aggravated assault, robbery, possession of an instrument of crime, persons not to possess firearms, carrying a firearm without a license, and carrying a firearm on a public street,[1] for the November 3, 2012, gunpoint robbery and shooting of Shaqwil Kemp.  On appeal, Crawford contends the suppression court abused its discretion when it prohibited him from asking the victim what he saw at the time of the crime, and when it denied his motion to suppress.  Crawford

---

[1] 18 Pa.C.S. §§ 2702, 3701, 907, 6105, 6106, and 6108, respectively.

further asserts the evidence was insufficient to identify him as the perpetrator of the crime. Upon our review of the record, the parties' briefs, and the relevant case law, we affirm.

The facts underlying Crawford's arrest and conviction are summarized by the trial court as follows:

> [O]n November 3, 2012, at approximately 2:30 p.m., Shaqwill Kemp was in the lobby of the Blumberg Projects, located at 1516 Judson Way in Philadelphia, waiting for an elevator to take him to his girlfriend's residence. When the elevator arrived, Mr. Kemp entered and was followed inside by [Crawford]. Mr. Kemp knew [Crawford] from the neighborhood for five (5) years by the moniker of "Reg[a]s".[7]

---

[7] Mr. Kemp provided [Crawford's] nickname to detectives, who were then able to tie that information to [Crawford] and produce his photograph. [The nickname is spelled both "Regis" and "Regas" throughout the proceedings and transcripts. In this appeal, we will use the spelling "Regas." adopted by both Crawford and the Commonwealth in their appellate briefs.]

---

> Mr. Kemp pushed the button for the 17th floor, and [Crawford] pushed the button for the 10th floor. [Crawford] then retrieved a black handgun from his waistband, pointed it at Mr. Kemp, and ordered him to hand over everything that he had. Mr. Kemp handed [Crawford] $845 in U.S. currency from his left pocket; [Crawford] went though Mr. Kemp's pockets and took his cell phone. [Crawford] then fired three (3) shots at Mr. Kemp, striking him in the right thigh and buttocks, and fled the elevator on the 10th floor.

> Bleeding profusely, Mr. Kemp exited the elevator on the 17th floor, where he encountered a woman and asked her to call an ambulance. Paramedics transported him to Hahnemann University Hospital for emergency treatment; fortunately, Mr. Kemp was able to survive his gunshot wounds.

Later that same day, Mr. Kemp met with detectives and described the [] events as detailed above. He also provided a physical description of [Crawford] along with his nickname "Reg[a]s", and positively identified him from a photo array. Further, Mr. Kemp testified to the above events at a grand jury hearing; there, in addition to the foregoing, he testified that when [Crawford] retrieved the handgun, he said, "[Y]ou know what it is, what you forgot, it was my cousin" – which Mr. Kemp understood to mean [Crawford's] cousin, "Newt", who had "pulled a gun out on [Mr. Kemp] the night before, and told [him] not to come around there no more."

* * * *

Not astonishingly, at trial, Mr. Kemp recanted a portion of his prior sworn statements. That is, while he testified to the events of the robbery/shooting as set forth above, he suddenly remembered that the culprit was *not* [Crawford] – whom he had known for five years – but an unidentifiable "masked man." [Crawford had made the same claim to the building security officers who responded immediately after the shooting. Moreover, when the first police officer on the scene asked Kemp who shot him, Kemp replied, "some dude." N.T., 11/14/2014, at 58. **See also** N.T., 11/13/2013, Exhibit C-5, Incident Report (stating culprit was "an unknown black male wearing a black mask"). It was not until he talked to officers later that evening that he identified the perpetrator as "Regas."]

The jury, however, embraced Mr. Kemp's prior sworn statements as the truth of the matter, as it was entitled to do.[8]

---

[8] The Commonwealth also presented the building's security officers, Christopher Moore and Andres Rodriguez, who both testified that, upon hearing the gunshots fired from inside the building, they went to the stairway exit where [Crawford] emerged within one (1) minute of the shooting. They attempted to stop [Crawford], who was concealing something in his pants, but [Crawford] struggled with them and "slipped out of his jacket" and fled. The officers yelled, "Come back and get your jacket. Come back and get your jacket" – but [Crawford] yelled back, "I'm cool. I'm good. Leave me alone", as he continued to flee. Inside the jacket were [$242.00 in] U.S. currency and a cell phone. Police at the scene secured the jacket and its

- 3 -

contents under property receipt, and the jacket was submitted to the laboratory for DNA testing. Following his apprehension, [Crawford] submitted to DNA testing, which matched the DNA found in the sleeve and collar of the jacket. In addition, Mr. Rodriguez positively identified [Crawford] from a photo array "without hesitation", and once again identified him at trial.

Trial Court Opinion, 11/5/2014, at 2-3, 8 (record citations omitted and emphasis in original).

Crawford was subsequently arrested and charged with the aforementioned crimes. His case was submitted to an investigating grand jury, which returned an indictment on all charges. On October 2, 2013, Crawford filed a pre-trial motion to suppress his identification by the victim *via* a photo array and during the grand jury proceedings. Following a hearing on November 1, 2013, the court denied the suppression motion. Crawford's case proceeded to trial, and on November 15, 2013, a jury found Crawford guilty of all charges. On February 28, 2013, the trial court imposed an aggregate sentence of 18 to 36 years' imprisonment.[2]

_____

[2] The trial court imposed a sentence of 10 to 20 years' imprisonment for the charge of aggravated assault, a consecutive five to 10 years' imprisonment for the charge of robbery, and a consecutive three to six years' imprisonment for the charge of persons not to possess firearms. No further penalty was imposed on the remaining offenses.

We note that the prosecutor mentioned during the sentencing hearing that a "five to ten mandatory minimum" was discussed with Crawford prior to trial. N.T., 2/28/2014, at 4. Nevertheless, upon our review of the sentencing transcript and the sentencing order, it does not appear a mandatory minimum sentence was imposed in this case. **See id.** at 1-21; Order, 2/28/2014. Accordingly, we detect no **Alleyne** issue with Crawford's sentence. **See Alleyne v. United States**, 133 S.Ct. 2151 (U.S. 2013); **Commonwealth v. Newman**, 99 A.3d 86 (Pa. Super. 2014) (*en banc*).

Thereafter, Crawford filed a timely post-sentence motion challenging the weight of the evidence and requesting reconsideration of his sentence. On March 12, 2014, the trial court denied Crawford's post-sentence motion, and this timely appeal followed.[3]

Crawford raises the following three issues for our review:

I. Did the suppression court abuse its discretion by prohibiting Crawford from asking the victim, and sole eyewitness to the crime, about what he saw at the time of the crime?

II. Did the suppression court abuse its discretion by denying Crawford's motion to suppress identifications where the court did not consider the totality of the circumstances and the identification procedure was unnecessarily suggestive?

III. Was the evidence insufficient as a matter of law to identify Crawford as the perpetrator beyond a reasonable doubt?

Crawford's Brief at 4.

First, Crawford argues the suppression court abused its discretion when it limited his examination of the victim during the suppression hearing. The following facts are germane to this issue.

During the suppression hearing, Crawford's attorney began his examination of Kemp by asking him, "Were you shot on November 3, 2012?" N.T., 11/1/2013, at 20. The prosecutor objected, and the court sustained the objection. Crawford's attorney explained to the court that this line of

_____

[3] On July 21, 2014, the trial court ordered Crawford to file a concise statement of errors complained of on appeal. Crawford complied with the court's directive, and filed a concise statement on August 6, 2014.

questioning was "going to go to [Kemp's] ability to see what happened at the time" which, the attorney argued, was part of the motion to suppress. *Id.* at 20, 21. The suppression court responded:

> We're here, Mr. Crawford, on your motion to suppress an [identification] because of it being unduly suggestive in process. Not the validity of his ability to observe who shot him. So, there [are] two different issues. That's a cross-examination issue for trial. You're here about the process of his identification of the defendant.

*Id.* at 21. Crawford's attorney further argued that Kemp's "ability to make an identification of any kind is based upon what he was able to see at the time[.]" *Id.* However, the suppression court stated, "No, actually, they're very separate issues." *Id.* at 22. At that point, rather than belabor the issue, Crawford's attorney asked the court to "[n]ote [his] objection," and moved on with his examination, questioning Kemp about the circumstances surrounding his identification of Crawford in the photo array. *Id.*

Nevertheless, later in the examination, Crawford's attorney was permitted to ask Kemp the following question: "Mr. Kemp, you initially told police that the man who shot you was both unknown to you and wearing a mask, correct?" *Id.* at 33. Kemp answered, "Yes." *Id.* As a follow-up question, Crawford's attorney asked, "So at approximately 2:30 on November 3 of 2012, the man was wearing a mask, and later that night, you circled a picture of somebody's face that had been covered by a mask?" *Id.* at 34. To this query, Kemp responded, "I circled it. I circled it a couple of months later. Like, not a couple months later, but later down the line." *Id.*

Further, during the suppression hearing, Kemp testified (1) when he was shown the photo array, he was sitting in an unmarked police car with two officers; (2) when he initially did not identify Crawford, the officers told him to "look carefully;" (3) when he was interviewed at the station after the shooting, an officer "said something about [him] getting locked up if [he doesn't] do the right thing[;]" and (4) before his grand jury testimony, the prosecutor told him his testimony "could help [him] with [his] open case." *Id.* at 22-23, 25-26, 29, 31.

Based upon this record, Crawford contends the suppression court misapplied the law when it refused to allow him to ask Kemp what Kemp saw at the time of the crime. He asserts that when ruling upon a motion to suppress, a court should consider the totality of the circumstances, which includes the witness's prior opportunity to observe the defendant and the existence of any discrepancy between the witness's prior description and the defendant's appearance. Crawford's Brief at 13, *citing* **Commonwealth v. Moore**, 633 A.2d 1119 (Pa. 1993), *cert. denied*, 513 U.S. 1114 (1995). Furthermore, Crawford argues, "[t]his Court has repeatedly held that … what witnesses see at the time of the crime is the 'most important factor[.]" ***Id.*** at 14, *citing* **Commonwealth v. Edwards**, 762 A.2d 382 (Pa. Super.

2000).[4]  Therefore, he contends the court's refusal to permit this line of questioning constituted an abuse of discretion.

It is well-settled that "[g]enerally, evidentiary decisions are left to the trial court's discretion and will not be reversed absent a clear abuse of that discretion." *Commonwealth v. Hicks*, 91 A.3d 47, 52 (Pa. 2014). Nevertheless, "not all error at trial ... entitles a [defendant] to a new trial,

_____

[4] We note that Crawford's citation to *Edwards*, *supra*, is taken out of context.  In *Edwards*, the appellant robbed a convenience store clerk and patron at gunpoint.  *Edwards*, *supra*, 762 A.2d at 384.  Three weeks later, both victims identified appellant as the assailant from a photo array.  *Id.*  On appeal, a panel of this Court considered whether appellant's trial counsel was ineffective for failing to request a line-up before the preliminary hearing, or failing to file a motion to suppress the victims' in-court identifications. Accordingly, the panel considered "whether the totality of the circumstances support[ed] an independent basis for [the victims'] identification" of appellant as the perpetrator of the crime.  *Id.* at 391.  In doing so, the panel explained:

> **The most important factor in the totality of the circumstances test is the opportunity of the witness to view the suspect at the time of the crime.**  This would seem to be particularly so when the witness was the victim, for as we have ... noted, "Whenever the victim of a crime has an opportunity to observe the criminal, the impression of the face of an assailant is etched upon the prey by the terror of the occasion[.]"

*Id.* (citation omitted and emphasis added).  Therefore, this Court considered **the opportunity of the witness to view the suspect during the crime** to be a significant factor, *i.e.*, was the robber masked, was there proper lighting, not necessarily, as Crawford suggests, "what witnesses see at the time of the crime."  Crawford's Brief at 14.

and [t]he harmless error doctrine ... reflects the reality that the accused is entitled to a fair trial, not a perfect trial[.]" ***Commonwealth v. Mosley***, 114 A.3d 1072, 1080 (Pa. Super. 2015) (quotation omitted). Accordingly, a court's error in erroneously excluding testimony may be harmless if the testimony is merely cumulative of other evidence that was properly admitted. ***Commonwealth v. Hawkins***, 701 A.2d 492, 508 (Pa. 1997), *cert. denied*, 532 U.S. 1083 (1998).

Here, Crawford's claim fails because the court was aware of the fact that Kemp initially did not identify his assailant. First, Detective Edward Keppol testified that Kemp initially told one of the responding officers that "a masked man" shot him. N.T., 11/1/2013, at 14. Detective Keppol further testified, however, when he asked Kemp why he initially declined to identify his attacker, Kemp replied, "I was scared." ***Id.*** at 15. More importantly, as detailed above, Crawford was permitted to ask Kemp if he initially told police the shooter was an unknown masked man. ***See id.*** at 33. Therefore, any error in the court's initial preclusion of this line of questioning was harmless.

Furthermore, Crawford does not explain what other relevant testimony he wanted to elicit, had he been permitted to ask Kemp what he "saw" at the time of the shooting. Accordingly, no relief is warranted on this claim.

In his second issue, Crawford argues the suppression court erred in denying his motion to suppress Kemp's identification.

Our review of an order denying a motion to suppress is well-established:

We may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

An appellate court, of course, is not bound by the suppression court's conclusions of law. However, it is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony.

*Commonwealth v. Davis*, 17 A.3d 390, 393 (Pa. Super. 2011) (citation omitted), *appeal denied*, 29 A.3d 371 (Pa. 2011).

Moreover, where, as here, the defendant contests identification evidence, "the central inquiry is whether, under the totality of the circumstances, the identification was reliable." *Id.* at 394 (citation omitted). With regard to a challenge to a photo array,

[o]ur Supreme Court has instructed that a photographic identification is unduly suggestive if, under the totality of the circumstances, the identification procedure creates a substantial likelihood of misidentification. *Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102, 112 (2004) (citation omitted).

Whether an out-of-court identification is to be suppressed as unreliable, and therefore violative of due process, is determined from the totality of the circumstances. We will not suppress such identification unless the facts demonstrate that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Commonwealth v. Burton*, 770 A.2d 771, 782 (Pa.Super.2001) (citations and quotations omitted). The variance between the photos in an array does not necessarily establish grounds for suppression of a victim's identification. *Id.* "Photographs used in line-ups are not unduly suggestive if the suspect's picture does not stand out more than those of the others, and the people depicted all exhibit similar facial characteristics." *Commonwealth v. Fisher*, 564 Pa. 505, 769

A.2d 1116, 1126 (2001). "[E]ach person in the array does not have to be identical in appearance." *Burton*, 770 A.2d at 782. The photographs in the array should all be the same size and should be shot against similar backgrounds. *Commonwealth v. Thomas*, 394 Pa.Super. 316, 575 A.2d 921 (1990).

*Commonwealth v. Kendricks*, 30 A.3d 499, 504 (Pa. Super. 2011), *appeal denied*, 46 A.3d 716 (Pa. 2012). Nevertheless,

[s]uggestiveness alone will not forbid the use of an identification, if the reliability of a subsequent identification can be sustained. To do so, the Commonwealth must establish that the in-court identification resulted from the criminal act and not the suggestive encounter.

*Commonwealth v. McGaghey*, 507 A.2d 357, 359 (Pa. 1986) (citations omitted).

Here, Crawford challenges Kemp's pre-trial identification of him as the assailant, arguing that both the identification procedure and the photo array, itself, were "so 'impermissibly suggestive' that they created 'a very substantial likelihood' that Kemp irreparably misidentified Crawford." *Id.* at 18.

With regard to the identification procedure, Crawford emphasizes (1) the officers told Kemp he would be locked up on probation if he did not do the right thing; (2) the photo identification occurred in a car, with two detectives present, and lasted ten to 15 minutes; (3) the officers spoke with Kemp for five minutes before showing him the photo array; (4) the officers told Kemp to "look carefully" after he failed to initially identify Crawford, and (5) Kemp took another five to seven minutes before he circled Crawford's photo. *See id.* at 17. Moreover, Crawford contends the photo array was

- 11 -

"impermissibly suggestive" because his photo "stands out more" than the others. *Id.* at 18. Specifically, he asserts he has longer hair on his head and face than the other suspects, all of the other men are either bald or have closely cropped hair, two of the men have short goatees, and he is the only suspect wearing a hooded sweatshirt. Accordingly, he claims the suggestiveness of both the photo array and identification procedure created "'a very substantial likelihood' that Kemp irreparably misidentified Crawford." *Id.*

However, the suppression court rejected Crawford's claim for several reasons. First, the court pointed to the fact that Kemp explained he initially stated he did not know who robbed him because he was scared. *See* Trial Court Opinion, 11/5/2014, at 12. More importantly, with regard to the purported suggestiveness of the photo array and the identification procedure, the suppression court emphasized,

> the unalterable fact remains that **Mr. Kemp is the source of [Crawford's] identity**, as he is the one who provided [Crawford's] nickname to police which is what yielded [Crawford's] photo. Moreover, the "suggestiveness" of the photo array is decidedly irrelevant as **Mr. Kemp knew [Crawford] from the neighborhood for many years.**

*Id.* (emphasis in original). The court, as fact finder, was entitled to credit Kemp's belated identification of "Regas" as his assailant, rather than his initial statement that he was attacked by an unknown, masked man. *Davis, supra. See* N.T., 11/1/2013, at 43-44 (suppression court found Kemp's testimony that he was threatened by officers to provide a suspect not

credible). Accordingly, once the court determined that Kemp knew the shooter by nickname for several years, we agree that any potential suggestiveness in the photo line-up was irrelevant. *See* N.T., 11/1/2013, at 44 (suppression court stated "the only way the detective got the defendant's photograph was from the information provided from Mr. Kemp to begin with."). Moreover, the court also noted that building security guard Andres Rodriguez unequivocally identified Crawford as the person he saw fleeing the apartment building just moments after the shooting. *See id.* at 12 n.9. Accordingly, we find no error or abuse of discretion on the part of the suppression court in denying Crawford's pre-trial suppression motion.

In his final claim, Crawford challenges the sufficiency of the evidence identifying him as the perpetrator of the crime.

> In reviewing the sufficiency of the evidence, we consider whether the evidence presented at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as the verdict winner, support the [fact finder's] beyond a reasonable doubt. *Commonwealth v. Murray*, [623] Pa. [506], 83 A.3d 137, 150–51 (2013). Whether sufficient evidence exists to support the verdict is a question of law; thus, our standard of review is de novo and our scope of review is plenary. *Id.* at 151.

*Commonwealth v. Patterson*, 91 A.3d 55, 66 (Pa. 2014), *cert. denied*, 135 S. Ct. 1400 (U.S. 2015). Furthermore, "the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence[,]" and an appellate court will not substituted its credibility determination for that of the jury.

*Commonwealth v. Cousar*, 928 A.2d 1025, 1033 (Pa. 2007), *cert. denied*, 553 U.S. 1035 (2008).

Here, Crawford argues the evidence was not sufficient to establish his identity as the shooter because the Commonwealth presented the jury with "two, opposing propositions that are equally reasonable and mutually inconsistent." Crawford's Brief at 21. First, the Commonwealth presented testimony that Kemp did not know his masked attacker, who robbed him of $845.00 and a cell phone. However, the Commonwealth also presented evidence that (1) Kemp told the police he was shot by a man he had known for several years as "Regas," (2) Kemp identified Crawford as "Regas" from a photo array, and (3) a security guard saw Crawford leaving the building moments after the shooting, with $242.00 in his jacket pocket and an unidentified cell phone. *Id.* Crawford emphasizes that the prosecutor never asked Kemp to identify the jacket removed from Crawford or the cell phone recovered from that jacket.[5] Therefore, he asserts the jury's determination that Crawford was the shooter "was both unreasonable and based on speculation and conjecture." *Id.* at 22.

---

[5] Indeed, during cross-examination, Detective Edward Keppol acknowledged that the property receipt for Kemp's cell phone indicated it was recovered inside 1516 Judson Way. N.T., 11/14/2014, at 53. *See also* Exhibit C-25, Property Receipt 3062871. The prosecutor never asked Detective Keppol if the phone recovered from the jacket was the same one stolen from Kemp.

We conclude, however, that the jury's verdict was properly based on its determination that Kemp initially lied when he stated he was unable to identify his attacker. Both in his subsequent statement to police, and, more importantly, in his testimony before the investigating grand jury, Kemp identified the shooter as "Regas." Indeed, during trial, the Commonwealth recounted Kemp's grand jury testimony in the following exchange:

[Prosecutor]. Shaqwill, do me a favor turn to Page 3 [referring to grand jury transcript]. That's where you get sworn in. And go down to line 12. Do you see there where it says by [the Commonwealth attorney]?

[Kemp]. Yes.

[Prosecutor]. I want you to follow along with me. I want you to tell me if this was your testimony on that day with no one there.

"By [Prosecutor]: Question: Mr. Kemp, I'm going to ask you a series of questions that we've spoken about for the ladies and gentlemen of the grand jury. Okay.

**Answer:** Yes.

**Question:** Do you recall the afternoon of November 3rd, 2012?

**Answer:** Yes.

**Question:** Around 2:30, can you tell me where you were, sir?

**Answer:** I was in the Blumberg Projects in the lobby.

**Question:** The Blumberg Projects. What type of building is that?

**Answer:** It's a high-rise building."

Do you remember that?

[Kemp]. Yes.

- 15 -

[Prosecutor].  "Question:  Who was in the lobby with you that day?

 **Answer:**  A guy named Reg[a]s.

 **Question:**  How long have you known Reg[a]s?

 **Answer:**  About 5 years?

 **Question:**  What happened after you were in that lobby, sir?

 **Answer:**  I hit the button for the 17th floor.  Reg[a]s hit the button for the 10th floor.  When I got to the 10th floor, he pulled out a gun, a black handgun and said you know, what it is, what you forgot.  He knew it was my cousin."

 Do you remember that?

[Kemp].  Yes.

[Prosecutor].  **Question:**  I'll ask you to speak slowly and loudly into the microphone,  Can you tell me again what did Reg[a]s say to you when he pulled out the handgun?

 **Answer:**  He said, you know what it is, what you forgot, it was my cousin.

* * * *

 **Question:**  Why did he say that to you?

 **Answer:**  He said this because Newt pulled a gun out on me the night before and he told me not to come around here no more.

 **Question:**  And Newt is [Regas's] cousin?

 **Answer:**  Yes.

 **Question:**  When he pulled that gun, where did he pull it from?

 **Answer:**  From his waistband.

 **Question:**  Did you see the gun when you initially got on the elevator with him?

 **Answer:**  No."

- 16 -

Do you remember all that, Mr. Kemp?

[Kemp].  Yes.

[Prosecutor].  And that's what you testified to, correct?

[Kemp].  Yes.

N.T., 11/13/2013, at 33-36 (reading from N.T., 3/15/2013, Indicting Grand Jury, at 4-5).

Therefore, the jury was presented with a credibility determination. Either Kemp lied immediately following the shooting and at trial when he stated the perpetrator was an unknown, masked man, or he lied in his statement to police and during the grand jury proceedings when he stated the culprit was a man he had known for several years as "Reg[a]s."  Clearly, the jury resolved the credibility determination in the Commonwealth's favor, a determination we will not disturb on appeal.  ***Cousar***, ***supra***.

Moreover, the Commonwealth presented corroborative evidence that Crawford was seen fleeing the apartment building moments after the shooting with his hands in his pants, and refused to stop to talk to the security officers.  ***See*** N.T., 11/14/2013, at 15.  In fact, Crawford was in such a hurry that he left his jacket behind.  ***Id.*** at 15, 24.  While the Commonwealth failed to prove the jacket contained either the proceeds from the robbery or the victim's cell phone, it was not required to do so.  ***See Com. v. Robinson***, 817 A.2d 1153, 1161 (Pa. Super. 2003) ("There is no requirement that the items taken in a theft or robbery be recovered.").

Once the jury determined that Kemp knew his assailant, and rejected Kemp's recantation of his prior statement, Crawford's challenge to the sufficiency of the evidence supporting his identification as the perpetrator of the crime failed. Indeed, his argument on appeal is more properly addressed to the weight of the evidence, rather than the sufficiency.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/18/2015