J-S71019-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DAQUAN HAMILTON | |
| Appellant | No. 1477 EDA 2016 |

Appeal from the Judgment of Sentence February 9, 2016
In the Court of Common Pleas of Montgomery County
Criminal Division at No: CP-46-CR-0001391-2014

BEFORE:  PANELLA, STABILE, and PLATT,[*] JJ.

MEMORANDUM BY STABILE, J.:          **FILED SEPTEMBER 18, 2018**

Appellant, Daquan Hamilton, appeals from his judgment of sentence of life imprisonment for second-degree murder[1] and related offenses.  We affirm.

On the evening of December 26, 2013, Appellant and Khaleef Jones visited an apartment complex in Pottstown.  Appellant told Jones that he wanted to get his stuff out of one of the apartments.  Steven Burns was inside the apartment with George Hashimbey and Angel Luna.  When Appellant knocked on the door, Burns opened the door but would not let Appellant inside.  N.T., 6/17/15, at 8-10, 90-96.

Appellant and Jones left the apartment building, but they returned shortly after midnight on the morning of December 27, 2015.  Before entering

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2502(b).

the building, Appellant handed Jones a .380 caliber gun and armed himself with a silver revolver. *Id.* at 93-94. Appellant and Jones returned to Burns' apartment, and Appellant told Jones to cover his face as they entered the elevator. They knocked on the apartment door, and Burns partially opened it. Appellant shoved his pistol into Burns' abdomen and forced his way inside. *Id.* at 10-11, 90-96. Burns and Appellant fought on the floor inside the door. Appellant yelled, "Shoot the nigger." As they struggled, Appellant fired his silver pistol, killing Hashimbey. *Id.* at 12-14, 98-99. Burns testified that he saw Appellant shoot Hashimbey. *Id.* at 14-15. Jones fired one shot into Burns' hip and ran down the stairs. Jones testified that he heard two shots after exiting the apartment. *Id.* at 99. Burns went into the hallway to ask a neighbor for help, and he remained there until police and paramedics arrived. *Id.* at 12-17, 98-99. The Commonwealth's ballistics expert testified that the bullet recovered from Hashimbey's body came from a .357 caliber gun, a different caliber from the gun Jones was carrying. N.T., 6/16/15, at 50.

Approximately ninety minutes after the shooting, Philadelphia Police Officer William Lynch stopped Appellant's car in a high crime neighborhood in North Philadelphia. When Officer Lynch ran the tags, he discovered a "try-and-locate" alert. Appellant, who was a passenger in the car, ran when he saw the police lights, but Jones stayed inside. Police arrested both men and recovered a .380 caliber gun from Jones' person during the arrest. N.T., 6/16/15, at 122-23. The police impounded the car and obtained a search warrant to search its passenger compartment. During the search, they

recovered two cell phones and a fired .357 cartridge casing. N.T., 6/16/15, at 130-39. Subsequently, a Montgomery County detective obtained another search warrant to examine the contents of the cell phones.[2]

At the conclusion of trial, the Commonwealth introduced letters that Appellant sent Jones while both men were incarcerated following their arrest. The first letter suggested that both men claim that Burns let them enter the apartment immediately before the shooting, and that Appellant "just came to get my clothes and see my cousin." N.T., 6/18/15, at 21. "Nobody was [supposed] to get hurt," Appellant continued, but Burns caused the shootings by starting a fight with Appellant. *Id.* In a second letter, Appellant stated that the Commonwealth was not offering him a plea bargain and was threatening to charge him with second-degree murder. *Id.* at 22-23. Appellant continued:

> I'm sorry for getting you in this shit. My lawyer said if I get on the stand, it would do more harm than good. Dam bro, I fucked up, but we can't cry over spilled milk . . . I need you to get on the stand and blame everything on [Burns]. Keep your head up. Fuck these crackers.

*Id.* at 23.

During closing argument, defense counsel did not deny that Appellant was present in the apartment during the shootings. Instead, counsel

---

[2] Appellant sought to suppress the contents of his cell phone in pre-trial motions, which the trial court denied. The contents recovered from the cell phones are described in our discussion of the suppression issue on pages 10-11 below.

contended that any actions that Appellant took were in self-defense. N.T., 6/18/15 at 74-93. The jury found Appellant guilty of second-degree murder, burglary and other offenses. On February 9, 2016, the trial court imposed sentence. Appellant filed timely post-sentence motions, which the trial court denied, and a timely notice of appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises six arguments in this appeal, which we reorganize for the sake of convenience:

I. Whether [Appellant]'s conviction for burglary was supported by sufficient evidence where: (1) the Commonwealth failed to prove beyond a reasonable doubt that at the time they entered the apartment, [Appellant] and/or his codefendant intended to commit any crime inside of the residence; and (2) the Commonwealth failed to prove that either [Appellant] or his codefendant was [not] licensed or privileged to enter the apartment by the actual resident[?]

II. Whether [Appellant]'s conviction for second-degree murder is supported by sufficient evidence where the Commonwealth failed to prove that the decedent was killed during [Appellant]'s commission of an enumerated felony or during the commission of an enumerated felony by his co-defendant[?]

III. Whether the trial court committed an error of law and/or abused its discretion in denying [Appellant's] motion to suppress the contents of his cell phone where the affidavit in support of the search warrant failed to establish probable cause to believe that evidence of that crime would be found in the phone's contents at the time that the warrant was issued[?]

IV. Whether the trial court committed an error of law and/or abused its discretion in denying [Appellant's] motion to suppress the identification made by David Anderson where the identification was tainted by his being shown a still surveillance video of the suspects prior to being shown the photographic array for identification purposes[?]

- 4 -

V. Whether the trial court committed an error of law and/or an abuse of discretion in denying [Appellant's] **Batson** challenge where: the prosecuting attorney failed to state a valid race-neutral reason for striking juror 11; and the learned court ruled in error that [Appellant] was required to establish a pattern of discrimination by the prosecution before he could present a **Batson** challenge?

VI. Whether the trial court committed an error of law and/or abused its discretion in failing to rule on defense counsel's objection to the prosecutor's act of improperly vouching for the testimony of the Commonwealth's witnesses during the Commonwealth's closing argument[?]

Appellant's Brief at 13-14.

We first examine whether the evidence is sufficient to sustain Appellant's convictions for burglary. When evaluating a sufficiency claim,

> our standard is whether, viewing all the evidence and reasonable inferences in the light most favorable to the Commonwealth, the factfinder reasonably could have determined that each element of the crime was established beyond a reasonable doubt. This Court considers all the evidence admitted, without regard to any claim that some of the evidence was wrongly allowed. We do not weigh the evidence or make credibility determinations. Moreover, any doubts concerning a defendant's guilt were to be resolved by the factfinder unless the evidence was so weak and inconclusive that no probability of fact could be drawn from that evidence.

**Commonwealth v. Kane**, 10 A.3d 327, 332 (Pa. Super. 2010).

A person commits burglary when, "with the intent to commit a crime therein, the person: . . . enters a building or occupied structure . . . in which at the time of the offense any person is present and the person commits, attempts or threatens to commit a bodily injury crime therein." 18 Pa.C.S.A. § 3502(a)(1). "It is a defense to prosecution for burglary if . . . at the time

of the commission of the offense . . . the actor is licensed or privileged to enter." 18 Pa.C.S.A. § 3502(b)(3).

Appellant contends that the Commonwealth failed to prove that he intended to commit a crime when entering the apartment. We disagree. Appellant and Jones brought guns with them when they returned to the apartment, and Appellant told Jones to hide his face from the camera in the elevator. When the apartment door opened, he shoved the muzzle of a gun into Burns' stomach. This evidence demonstrates Appellant's intent to commit a crime inside the apartment.

Appellant also argues that the Commonwealth failed to prove that he was not licensed or privileged to enter the apartment. This argument suggests erroneously that the Commonwealth had the burden of proof on this issue. Section 3502 plainly states that license and privilege are affirmative defenses for which the defendant shoulders the burden of proof. It is permissible to require the defendant to prove these elements, because "the burden of proving an affirmative defense that relieves the accused of criminal responsibility, but does not negate an element of the offense charged[,] may be placed on the defendant." **Commonwealth v. Collins**, 810 A.2d 698, 701 (Pa. Super. 2002).

Construed in the light most favorable to the Commonwealth, the evidence demonstrates that Appellant failed to satisfy his burden of proof. Appellant did not present any evidence that he had any residential interest in

the apartment or some other right that entitled him to enter. The occupants inside the apartment refused to let Appellant in the first time he knocked on the door, and several hours later, he forced his way in with a gun. From these facts, the jury had the right to infer that Appellant had no license or privilege to enter.

Next, Appellant contends that the evidence was insufficient to support his conviction for second-degree murder, because the victim did not die during the perpetration of a felony. We disagree. "A criminal homicide constitutes murder of the second degree when it is committed while the defendant was engaged as a principal or an accomplice in the perpetration of a felony." 18 Pa.C.S.A. § 2502(b). Burglary is a felony, 18 Pa.C.S.A. § 3502(c), and we have held above that the evidence is sufficient to sustain Appellant's conviction for burglary. Thus, the evidence establishes that the victim died during the perpetration of a felony.

In his third argument, Appellant claims that the trial court erred in denying his motion to suppress by (1) ruling that police officers had reasonable suspicion on December 27, 2013 to stop the car in which Appellant was a passenger, and (2) probable cause existed to issue the search warrant for one of the cell phones seized from the car.

Appellant waived his objection to the ruling that police officers had reasonable suspicion to stop the vehicle in which he was a passenger by failing to raise this issue in his Pa.R.A.P. 1925 statement. The lone suppression issue

in Appellant's Rule 1925 statement pertained to the search warrant for his cell phone. As a result, the trial court did not address this issue in its opinion, thus impeding effective appellate review. Pa.R.A.P. 1925(b)(4)(vii) ("[i]ssues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived"); *Commonwealth v. Lemon*, 804 A.2d 34, 36-37 (Pa. Super. 2002) (issues not included in Rule 1925 statement are waived because omission impedes preparation of trial court's legal analysis).

Even if Appellant had preserved this issue for appeal, it is devoid of merit. When reviewing a trial court's denial of a motion to suppress evidence,

> [we are] limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of the courts below are subject to [ ] plenary review.

*Commonwealth v. Parker*, 161 A.3d 357, 361–62 (Pa. Super. 2015).

"The Fourth Amendment to the [United States] Constitution and Article I, Section 8 of [the Pennsylvania] Constitution protect citizens from unreasonable searches and seizures." *Commonwealth v. McAdoo*, 46 A.3d

781, 784 (Pa. Super. 2012). "To secure the right of citizens to be free from such intrusions, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty." *Commonwealth v. Reppert*, 814 A.2d 1196, 1201 (Pa. Super. 2002). Courts recognize three types of interactions between members of the public and the police: a mere encounter, an investigative detention, and a custodial detention.

> A mere encounter between police and a citizen need not be supported by any level of suspicion, and carr[ies] no official compulsion on the part of the citizen to stop or to respond. An investigatory stop, which subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute an arrest, requires a reasonable suspicion that criminal activity is afoot. A custodial search is an arrest and must be supported by probable cause.

*Commonwealth v. Fuller*, 940 A.2d 476, 479 (Pa. Super. 2007). In evaluating whether an interaction rises to the level of an investigative detention, "the court must examine all the circumstances and determine whether police action would have made a reasonable person believe he was not free to go and was subject to the officer's orders." *Commonwealth v. Stevenson*, 832 A.2d 1123, 1127 (Pa. Super. 2003). Prior to an investigatory detention, the officer "must harbor at least a reasonable suspicion that the person seized is then engaged in unlawful activity." *Commonwealth v. Barber*, 889 A.2d 587, 593 (Pa. Super. 2005). "Reasonable suspicion is a less stringent standard than probable cause necessary to effectuate a

warrantless arrest, and depends on the information possessed by police and its degree of reliability in the totality of the circumstances." **Commonwealth v. Brown**, 996 A.2d 473, 477 (Pa. 2010). "[I]nnocent facts, when considered collectively, may permit the investigative detention." **Id.** Police officers, however, "need not personally observe the illegal or suspicious conduct, but may rely upon the information of third parties, including tips from citizens." **Commonwealth v. Smith**, 904 A.2d 30, 36 (Pa. Super. 2006).

Here, Detective Lynch, the Philadelphia detective who stopped the vehicle in which Appellant was a passenger, reasonably suspected that the driver was operating the car without authorization. The detective ran the tags because the car was in a known high-crime area in North Philadelphia, and he learned that a "try-and-locate" notice was on the registration, which meant that the car might have been a rental that was not returned on time. N.T., 6/15/15, at 9, 11-12. These factors gave the detective reasonable suspicion to stop the car for further investigation.

Next, Appellant contends that the search warrant for his cell phones failed to establish probable cause for the search. The contents of the cell phones introduced during trial were text messages from Appellant to Appellant's brother between 10:29 p.m. and 11:43 p.m. on December 26, 2013 (between Appellant's first and second visit to Burns' apartment). Appellant's brother texted, "You got to grab da 380," and Appellant responded, "I know." Appellant asked, "Where it's at?" and his brother replied, "Da hotel."

N.T., 6/18/15, at 18. The gist of these messages was Appellant's agreement with his brother that Appellant needed the .380 caliber pistol and information from his brother that the pistol was at the "hotel."

A reviewing magistrate must review the totality of the circumstances presented in the affidavit to determine whether there is a fair probability that evidence of the alleged crime will be reaped through execution of the warrant. *Commonwealth v. Sharp*, 683 A.2d 1219, 1223 (Pa. Super. 1996). Appellant argued that there was no evidence of any cell phone use at the time of the murder, so there was not a fair probability that the police would recover any evidence of the crime from his phone. We agree that the search warrant failed to establish probable cause, but we also conclude that the introduction of the contents of the cell phones during trial was harmless error.

We summarize the averments in the affidavit of probable cause underlying the warrant as follows:

- Shortly after midnight on December 27, 2013, Officer Fritz, one of the first officers at the murder scene, Apartment 524, spoke with Steven Burns, who was suffering from multiple gunshot wounds. Burns stated that two armed gunmen had shot him inside the apartment.

- Officer Fritz recovered a cell phone from Burns.

- Corporal Hatfield entered the apartment and saw Hashimbey, who was pronounced dead at the scene. There was a cell phone near his body.

- Detectives discovered one fired .380 shell casing and one unfired .380 caliber bullet on the apartment floor.

- Detectives interviewed Burns at the hospital after Burns underwent surgery for his bullet wounds. Burns told them that he had seen two men on the evening of December 26, 2013 in the apartment elevator. Burns and the men exited the elevator on the fifth floor and went in opposite directions. Shortly after Burns entered Apartment 524, Burns answered a knock at the door and observed the two men he had seen on the elevator. One man asked whether "Miguel" was inside. Burns answered "no," and the man asked to come inside to pick up his "stuff." Burns replied that they could not come in because Miguel was not home. The two men left. Burns commented to Hashimbey that the men had been on the elevator with him but went in a different direction after exiting. Hashimbey replied that the men probably went to Apartment 507. Later that evening, around midnight, Burns answered another knock at the door. The two men forced their way into the apartment. One man said, "yo, I gotta get my stuff," and Burns saw that both men were holding revolvers. One

man said "shoot that nigga," and the other man shot Burns in the hip.

- Angel Luna was in the apartment with Burns and Hashimbey at the time the two men forced their way inside. Luna's account of the events was consistent with Burns' account.

- Police recovered surveillance video of the encounter on the elevator between Burns and the two men at 9:15 p.m. and the two men returning to the fifth floor on the elevator at midnight. One of the men was wearing a blue Penn State jacket, a gray hoodie underneath and camouflage pants.

- On December 28, 2013, detectives interviewed David Anderson, a resident in Apartment 507. Anderson stated that on the evening of December 26, 2013, a man named Curtis Harrell had visited his apartment. After Harrell left, two men visited Anderson's apartment looking for Harrell. Anderson knew one of the men as "Dre" but did not know the other man. The detectives showed Anderson a still photograph from the surveillance video, and Anderson identified the men in the photograph as the men who came to his apartment looking for Harrell.

- A detective checked Harrell's criminal history and learned that Philadelphia police had arrested Harrell on November 8, 2008 along

with Daquan Hamilton, Appellant herein, and charged them with drug-related offenses.

- A detective then learned that Appellant had been arrested in Philadelphia at 1:41 a.m. on December 27, 2013 following a traffic stop of a Toyota with a registration number of EJE-3813. Appellant had run away from the vehicle following the traffic stop but was apprehended. Another male in the vehicle, Khaleef Jones, was also arrested. Jones was wearing the same clothes that one of the men in the surveillance video had been wearing: a blue jacket, gray hoodie and camouflage pants. Jones also was in possession of a .380 caliber pistol, the same caliber as the ammunition found at the crime scene inside Apartment 524.

- On December 28, 2013, a detective showed Burns separate sequential photo arrays containing Appellant's and Jones' photographs. Burns identified both men as the males who forced their way into Apartment 524 and committed the shootings.

- On December 29, 2013, Jones gave a statement to police in which he admitted entering Apartment 524 with Appellant and shooting his gun, but he claimed that the shot only struck a wall. Jones' account of the events indicated that Appellant fired the shots that injured Burns and killed Hashimbey. Jones and Appellant exited the apartment, and another man, "Tone," drove them to Philadelphia

- On January 2, 2014, a detective and police officer executed a search warrant on the Toyota that Jones and Appellant were driving at the time of the traffic stop. The detective recovered two cell phones and a camera/music device.

Exhibit C-1 (search warrant for cell phones).

The allegations in the affidavit of probable cause do not furnish probable cause to believe that the police would find evidence of crime on the cell phones recovered in the Toyota. The affidavit does not allege that Appellant or Jones talked on their cell phones to plan the break-in or to discuss shooting the victims in advance of the break-in. Neither does the affidavit state that Appellant or Jones talked on their cell phones after shooting the victims and leaving the apartment. Nor does the affidavit allude to any other fact that would indicate a nexus between the cell phones and the charges against Appellant. Standing alone, the fact that the police discovered two cell phones in the vehicle driven by Jones and Appellant after the shooting does not provide reason to believe that the cell phones contained evidence of the crimes in question. Therefore, the trial court erred by denying Appellant's suppression motion.

Nevertheless, this error was harmless. Harmless error exists

if the state proves either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the

> prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Burno*, 154 A.3d 764, 787 (Pa. 2017). The text messages seized from the cell phones were cumulative of other untainted evidence. The text messages indicated Appellant's intent to (1) obtain a .380 caliber pistol and (2) return to Burns' apartment and attack Burns. The Commonwealth submitted other untainted evidence that proved the same facts. With regard to (1), Jones testified that before the second, fateful entry into Burns' apartment, Appellant handed him a .380 caliber pistol. Jones entered the apartment, shot the .380 caliber pistol once and ran out into the hallway. Jones continued carrying the .380 caliber pistol until his arrest ninety minutes after the shooting. With regard to (2), Jones testified that he and Appellant drove back to the apartment complex, where Appellant handed Jones the .380 caliber pistol and told Jones to cover his face before they entered the elevator. Burns testified that Appellant forced his way into the apartment, shouted "shoot the nigger," and shot Hashimbey. Jones testified that he entered the apartment, fired his gun once, and ran out into the hall. He heard two more gunshots as he exited. In addition to this eyewitness testimony, Appellant wrote Jones letters following their arrest in which Appellant admitted responsibility for the murder—"I'm sorry for getting you in this shit . . . Dam bro, I fucked up, but we can't cry over spilled milk"—but implored Jones to blame the incident on Burns. Finally, ballistics evidence establishes that the bullet that killed Hashimbey came from a .357 caliber

pistol. Since Jones was carrying a .380 caliber pistol, Appellant was carrying the .357 caliber pistol that fired the fatal shot. For these reasons, the erroneous admission of the cell phone evidence does not entitle Appellant to relief.

We note that our decision today is distinguishable from **Commonwealth v. Fulton**, 179 A.3d 475 (Pa. 2018), in which our Supreme Court criticized this Court's harmless error analysis. In **Fulton**, this Court held that the search of the defendant's cell phone was illegal, but that any error was harmless in light of other properly admitted evidence of the defendant's guilt. Our Supreme Court observed that this Court applied the third harmless error test—*i.e.*, "the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Id.* at 493-94. The Supreme Court continued, however, that

> the Superior Court failed entirely to discuss whether the evidence that it relied on to find harmless error was contradicted by other evidence of record. This omission from its determination of harmlessness is fatal to its conclusion . . . [O]verwhelming evidence of a defendant's guilt is never harmless unless that evidence is uncontradicted.

*Id.* at 494. In the present case, we apply a harmless error test different from the test this Court applied in **Fulton**, namely "whether the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence." **Burno**, 154 A.3d at 787. Moreover, as established above, the evidence seized from the

cell phones in the present case is cumulative of other untainted and properly admitted evidence that proves the same facts.

In his next argument, Appellant contends that the trial court erred in denying his motion to suppress Anderson's out-of-court identification of Appellant from a photo array. Appellant argues that the police made the identification procedure unduly suggestive by showing Anderson a still surveillance video of the suspects six hours before showing him the photo array.[3]

We disagree with Appellant. The trial court opinion explained its reasons for denying Appellant's motion in its opinion as follows:

> [W]hether an out of court identification is to be suppressed as unreliable, and therefore violative of due process, is determined from the totality of the circumstances. *Commonwealth v. Carson*, 741 A.2d 686, 697 (1999), abrogated on other grounds, by *Commonwealth v. Freeman*, 827 A.2d 385 (Pa. 2003).
>
> Suggestiveness in the identification process is a factor to be considered in determining the admissibility of such evidence, but suggestiveness alone does not warrant exclusion. *Commonwealth v. Kubis*, 978 A.2d 391, 396 (Pa. Super. 2009). Identification evidence will not be suppressed unless the facts demonstrate that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Commonwealth v. Burton*, 770 A.2d 771, 782 (Pa. Super. 2001), appeal denied, 868 A.2d 1197 (Pa. 2005), overruled on other grounds by *Commonwealth v. Mouzon*, 812 A.2d 617, 623 (Pa. 2002). Photographs in lineups are not unduly suggestive if the suspect's

---

[3] As noted above, Burns identified Appellant and Jones from photo arrays prepared by the police. In the present argument, Appellant objects to Anderson's out-of-court identification of Appellant but not to Burns' out-of-court identification.

picture does not stand out more than the others, and the people depicted all exhibit similar facial characteristics. ***Commonwealth v. Fisher***, 769 A.2d 1116, 1126-27 (Pa. 2001).

During suppression, [Appellant] argued that Mr. Anderson was shown a still shot of a surveillance video depicting [Appellant] and Khaleef Jones outside of the apartment in question at the time of the incident. A few hours later, Mr. Anderson was shown a photo array and asked if he recognized anyone, whereby Mr. Anderson identified [Appellant]. Thus, the defense contended that the identification should be suppressed as impermissibly suggestive. The trial court disagreed. Indeed as demonstrated by the record, the trial court went to great lengths to determine whether the identification process was suggestive, requesting to see the surveillance still which had not been introduced into evidence, and also requesting that the [d]etective involved in the photo identification process [be] further questioned. (Please see Notes of Testimony from 2/6/15, pgs. 52-61). Indeed, the court stated,

THE COURT: I want to make sure we target this. Your argument isn't as much the array itself was prejudicial, the argument that I'm hearing is that by virtue of showing a picture of [Appellant] earlier in the day, you've not tainted the witness and that's what I want to hear argument about. [ . . . ]

THE COURT: What was he told when he was shown the earlier photo? I mean, I think there's things here that we're not bringing that out that might be helpful to resolving this. I want to know what he was told when he was shown the earlier photo—what discussion was had there—and I'd like to see the photo.

[The Commonwealth]: Sure. We can get the photo for you, Your Honor.

THE COURT: Okay. Could you do that? That would be very helpful.

MR. WHALLEY: Detective Richard can testify again if he needs to.

THE COURT: I would like to know that. I'm going to ask him to come back up on the stand.

(Please see Notes of Testimony from 2/6/15, pgs. 52-61)

Upon further inquiry, Detective Richard indicated that they were canvassing the apartment building to learn if anyone had information on the homicide that occurred in the building the day prior. He spoke to Mr. Anderson at the apartment building, and then Mr. Anderson later went to the police station to provide further information. Mr. Anderson indicated that a man named Dre had visited his apartment on the night in question. The [d]etective then showed Anderson some individual photographs followed by some surveillance still shots, including the photograph with [Appellant] and Khaleef Jones in it. Detective Richard further explained,

[Detective Richard]: Then I said I would like to show you some surveillance photos to see if you know the people in the surveillance photos. That was the extent of the conversation. As far as I knew at that point, the two people in the surveillance photos, they could have lived there. I had no idea what their involvement was, but I know they were there about the time I needed to talk to them so I wanted to find out who they were. [. . . ]

MR.COOPER: So you showed the picture that we just looked at which was C-4 or 5, whatever that was, right?

DETECTIVE RICHARD: The surveillance still. [. . . ]

MR. COOPER: Okay. And he said that's Dre?

DETECTIVE RICHARD: He said I recognize the first person as Dre. I don't know the person behind him. [ . . . ]

MR. COOPER: And you found out who he [Dre] was based on the research; is that correct?

DETECTIVE RICHARD: Yes, we eventually found out who he was.

(Notes of Testimony 2/16/15, pgs. 61-62)

The [d]etective eventually found out that Dre was [Appellant] herein. Later that day, Mr. Anderson returned to the police station to view the photo array at issue whereby he identified an individual in one of those photos as Dre.

After hearing the above testimony and viewing the surveillance photo, the trial court determined that the identification procedure was not unduly suggestive. (Notes of Testimony 2/16/15, p. 68). The trial court deemed Detective Richard's testimony credible[,] indicating that he originally showed Anderson the surveillance photograph outside of the apartment building purely to gather information about individuals at the scene at the time of the incident. At that point, law enforcement had no suspects. Mr. Anderson recognized [Appellant] in the photograph as Dre, the individual who visited him at his apartment on the night in question. Again at that point Detective Richard [was] merely gathering information concerning the individuals at the scene who could provide information. Mr. Anderson left the police department and the investigators continue[d] gathering information, including information on Dre. They learn[ed] Dre's name [was] actually Daquan Hamilton, [Appellant] herein. When Mr. Anderson [was] called back to the police department to view a photo array, Daquan Hamilton's photograph [was] included therein. Mr. Anderson indicate[d] that he recognize[d] [Appellant's] photograph and identifie[d] him as Dre.

The court found that the identification process was not unduly suggestive[,] given the quality of the surveillance photograph at issue; given that the photograph was shown during the initial information gathering process wherein there were not yet any suspects; given that Mr. Anderson was never told that the men in the photograph were suspects; given that Mr. Anderson did not recognize the co-defendant [Jones] in the photograph; given that time passed between showing Mr. Anderson the surveillance photograph and the actual photo array; given that Mr. Anderson identified [Appellant] as Dre; and, given that there was nothing suggestive about the photo array itself. Thus, for all of those reasons, the trial court properly declined to suppress the identification.

Trial Court Opinion, 11/30/16, at 4-8. We agree with the trial court's thorough analysis and find no merit in Appellant's argument.

Appellant next argues that the Commonwealth violated his constitutional rights by exercising a peremptory strike against Juror 11, an African-American, with discriminatory intent. Appellant argues that the

Commonwealth failed to state a valid race-neutral reason for striking Juror 11, and that the trial court erred by ruling that he was required to establish a pattern of discrimination before he could present a **Batson**[4] challenge relating to Juror 11. We disagree.

**Batson** held that the racially motivated use of peremptory challenges to strike prospective jurors violates the Equal Protection Clause of the Fourteenth Amendment. The Supreme Court set forth a three-part test for examining the defendant's claim that the prosecutor exercised peremptory challenges in a racially discriminatory manner: first, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on the account of race; second, if a *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried the burden of proving purposeful discrimination. **Commonwealth v. Fletcher**, 861 A.2d 898, 909 (Pa. 2004) (citing **Batson**). The trial court's decision on the ultimate question of discriminatory intent

> represents a finding of fact of the sort accorded great deference on appeal and will not be overturned unless clearly erroneous. Such great deference is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations. Moreover, there will seldom be much evidence on the decisive question of whether the race-neutral explanation for a peremptory

---

[4] **Batson v. Kentucky**, 476 U.S. 79 (1986).

challenge should be believed; the best evidence often will be the demeanor of the prosecutor who exercises the challenge.

***Commonwealth v. Williams***, 980 A.2d 510, 531 (Pa. 2009).

The record demonstrates that the Commonwealth articulated a race-neutral reason for striking Juror 11: she suffered from migraine headaches. The trial court found this explanation credible. Trial Ct. Op. at 14. We must accord great deference to this decision, ***Williams***, 980 A.2d at 531, and we see nothing in the record that casts doubt on the court's conclusion. Since Appellant's ***Batson*** challenge to striking Juror 11 lacks merit, his complaint that the trial court erroneously required him to demonstrate a pattern of discrimination before presenting a ***Batson*** challenge to Juror 11 is moot.

Finally, Appellant seeks a new trial based on alleged prosecutorial misconduct during closing argument. First, Appellant claims that the prosecutor improperly vouched for the credibility of Jones, who testified for the Commonwealth. The prosecutor stated:

> [The Commonwealth]: I submit, maybe they lied six months ago. Maybe they might lie tomorrow. Yesterday, they were telling the truth. They sat there yesterday and told you the truth. [Jones] sat there and stood like a man and finally told you what happened. May not have been telling the truth last month. He told the truth yesterday. All the evidence points to that. He did tell the truth yesterday, and that's the only time he has to tell the truth was yesterday.
>
> [Defense counsel]: Objection.
>
> [The Commonwealth]: Then he said they want back to the apartment complex.

N.T., 6/18/15, at 121-22.

- 23 -

To begin with, Appellant waived this issue due to defense counsel's failure to specify any grounds for his objection. ***Commonwealth v. Lopez***, 57 A.3d 74, 82 (Pa. Super. 2012) (party must make timely and specific objection to preserve issue for appellate review; merely stating "objection" is insufficient). Even if Appellant had preserved this issue, it is devoid of merit. "[T]he prosecution is accorded reasonable latitude, may employ oratorical flair in arguing its version of the case to the jury, and may advance arguments supported by the evidence or use inferences that can reasonably be derived therefrom." ***Commonwealth v. Jaynes***, 135 A.3d 606, 615 (Pa. Super. 2016). The prosecutor herein argued that the witnesses told the truth on the stand because they were under oath, despite their earlier lies. These facts—the witnesses had given prior inconsistent statements and were under oath when they testified—were in the record. N.T., 6/17/15, at 78-80. Therefore, the prosecutor advanced arguments that found support in the record, and he did not improperly vouch for any witness's credibility.

Second, Appellant argues that the Commonwealth prejudiced him during closing argument by stating that the jury was the "voice" for the deceased victim, Hashimbey. At the beginning of closing argument, the prosecutor stated: "The only person who can't speak anymore is George Hashimbey . . . He really doesn't have a voice anymore. He's never gonna speak again, never talk with his parents, anything. So he's the one who can't speak any more. He was silenced." N.T., 6/18/15, at 94. At the conclusion

of his closing, the prosecutor added, "You're his voice. You're his voice for him. You're his voice for the family." *Id.* at 141.

Once again, Appellant waived this argument, because defense counsel did not object to either of the Commonwealth's "voice" statements. *Lopez*, 57 A.3d at 82. Even if Appellant preserved this objection, it does not warrant any relief.

> [I]t is well settled that any challenged prosecutorial comment must not be viewed in isolation, but rather must be considered in the context in which it was offered. Our review of a prosecutor's comment and an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial. Thus, it is well settled that statements made by the prosecutor to the jury during closing argument will not form the basis for granting a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict. The appellate courts have recognized that not every unwise remark by an attorney amounts to misconduct or warrants the grant of a new trial.

*Jaynes*, 135 A.3d at 615 (citations and quotation marks omitted). The prosecutor made a passing remark during a lengthy closing argument that the jury served as the victim's "voice." While this comment might have been unnecessary, it did not have the unavoidable effect of prejudicing the jury. The Commonwealth presented strong evidence of Appellant's guilt during trial, and the trial court instructed the jury to base its verdict on the evidence and not on counsel's arguments. N.T., 6/18/15, at 160-62. We conclude that the jury decided this case based on the evidence presented against Appellant, not on the closing argument of the Commonwealth.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/18/18